## ALDINGER *v.* HOWARD, TREASURER OF SPOKANE COUNTY, ET AL.

No. 74–6521.  Argued March 24, 1976—Decided June 24, 1976

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, POWELL, and STEVENS, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 19.

*Norman Rosenberg* argued the cause for petitioner. With him on the brief was *R. Max Etter, Sr.*

*Donald C. Brockett* argued the cause and filed a brief for respondents.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

This case presents the "subtle and complex question with far-reaching implications," alluded to but not answered in *Moor* v. *County of Alameda,* 411 U. S. 693, 715 (1973), and *Philbrook* v. *Glodgett,* 421 U. S. 707, 720 (1975): whether the doctrine of pendent jurisdiction extends to confer jurisdiction over a party as to whom

no independent basis of federal jurisdiction exists. In this action, where jurisdiction over the main, federal claim against various officials of Spokane County, Wash., was grounded in 28 U. S. C. § 1343 (3), the Court of Appeals for the Ninth Circuit held that pendent jurisdiction was not available to adjudicate petitioner's state-law claims against Spokane County, over which party federal jurisdiction was otherwise nonexistent. While noting that its previous holdings to this effect were left undisturbed by *Moor,* which arose from that Circuit, the Court of Appeals was "not unaware of the widespread rejection" of its position in almost all other Federal Circuits. 513 F. 2d 1257, 1261 (1975). We granted certiorari to resolve the conflict on this important question. 423 U. S. 823 (1975). We affirm.

I

This case arises at the pleading stage, and the allegations in petitioner's complaint are straightforward. Petitioner was hired in 1971 by respondent Howard, the Spokane County treasurer, for clerical work in that office. Two months later Howard informed petitioner by letter that although her job performance was "excellent," she would be dismissed, effective two weeks hence, because she was allegedly "living with [her] boy friend." Howard's action, petitioner alleged, was taken pursuant to a state statute which provides that the appointing county officer "may revoke each appointment at pleasure." [1] Though a hearing was requested, none was held before or after the effective date of the discharge.

Petitioner's action in the United States District Court for the Eastern District of Washington, as embodied in her second amended complaint, claimed principally under

---

[1] Wash. Rev. Code § 36.16.070 (1974).

4

the Civil Rights Act of 1871, 42 U. S. C. § 1983,[2] that the discharge violated her substantive constitutional rights under the First, Ninth, and Fourteenth Amendments, and was procedurally defective under the latter's Due Process Clause. An injunction restraining the dismissal and damages for salary loss were sought against Howard, his wife, the named county commissioners, and the county. Jurisdiction over the federal claim was asserted under 28 U. S. C. § 1343 (3),[3] and pendent jurisdiction was alleged to lie over the "state law claims against the parties." As to the county, the state-law

---

[2] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[3] "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

.        .        .        .        .

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States . . . ."

The Court of Appeals also noted that petitioner's complaint alleged that jurisdiction lay under 28 U. S. C. § 1331, and that the amount in controversy exceeded $10,000. This was apparently an attempt to plead a cause of action directly under the Fourteenth Amendment, irrespective of the implementing civil rights legislation. The Court of Appeals, however, stated that petitioner had "consistently chosen to rely upon" 42 U. S. C. § 1983, together with 28 U. S. C. § 1343 (3), and pendent jurisdiction as the bases for her action against Spokane County. Thus, neither the District Court nor the Court of Appeals reached the question whether the complaint stated a cause of action over which § 1331 jurisdiction would lie. Petitioner did not raise the question in her petition for certiorari, and it is therefore not before us.

claim was said to rest on state statutes waiving the county's sovereign immunity and providing for vicarious liability arising out of tortious conduct of its officials. 513 F. 2d, at 1358. The District Court dismissed the action as to the county on the ground that since it was not suable as a "person" under § 1983, there was no independent basis of jurisdiction over the county, and thus "this court [has no] power to exercise pendent jurisdiction over the claims against Spokane County." From this final judgment, see Fed. Rule Civ. Proc. 54 (b), petitioner appealed.

The Court of Appeals first rejected petitioner's claim that her § 1983 action against the county fell within the District Court's § 1343 (3) jurisdiction, as obviously foreclosed by this Court's decisions in *Moor, supra,* and *City of Kenosha* v. *Bruno,* 412 U. S. 507 (1973). Turning to petitioner's pendent-jurisdiction argument, the Court of Appeals noted, 513 F. 2d, at 1260, that the District Court had made no alternative ruling on the "suitability of this case for the discretionary exercise of pendent jurisdiction" under the second part of the rule enunciated in *Mine Workers* v. *Gibbs,* 383 U. S. 715, 726–727 (1966). But since this Court in *Moor* had expressly left undisturbed the Ninth Circuit's refusal to apply pendent jurisdiction over a nonfederal party, the instant panel felt free to apply that rule as set out in *Hymer* v. *Chai,* 407 F. 2d 136 (CA9 1969), and *Moor* v. *Madigan,* 458 F. 2d 1217 (CA9 1972), aff'd in part, rev'd in part, 411 U. S. 693 (1973). This kind of case, the Court of Appeals reasoned, presented the "weakest rationale" for extension of *Gibbs* to pendent parties: (1) The state claims are pressed against a party who would otherwise not be in federal court; [4] (2) diversity cases generally present more

---

[4] There is no diversity of citizenship under 28 U. S. C. § 1332 among the parties here, since all are citizens of the State of Washington.

attractive opportunities for exercise of pendent-party jurisdiction, since all claims therein by definition arise from state law; (3) federal courts should be wary of extending court-created doctrines of jurisdiction to reach parties who are expressly excluded by Congress from liability, and hence federal jurisdiction, in the federal statute sought to be applied to the defendant in the main claim; (4) pendent state-law claims arising in a civil rights context will "almost inevitably" involve the federal court in difficult and unsettled questions of state law, with the accompanying potential for jury confusion. 513 F. 2d, at 1261–1262.

## II

The question whether "pendent" federal jurisdiction encompasses not merely the litigation of additional *claims* between parties with respect to whom there is federal jurisdiction, but also the joining of additional *parties* with respect to whom there is no independent basis of federal jurisdiction, has been much litigated in other federal courts [5] and much discussed by commentators [6] since this Court's decision in *Gibbs*. *Gibbs*, in turn, is the most recent in a long line of our cases dealing with the relationship between the judicial power of the United States and the actual contours of the cases and controversies to which that power is extended by Art. III.

In *Osborn* v. *Bank of the United States*, 9 Wheat. 738

---

[5] See, *e. g.*, cases cited in *Moor* v. *County of Alameda*, 411 U. S. 693, 713–714, nn. 29–30 (1973).

[6] See, *e. g.*, 3A J. Moore, Federal Practice ¶ 18.07[1.–4] (2d ed. 1974); P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 921–926 (2d ed. 1973); C. Wright, Law of Federal Courts § 19 (2d ed. 1970); Fortune, Pendent Jurisdiction—The Problem of "Pendenting Parties," 34 U. Pitt. L. Rev. 1 (1972); Shakman, The New Pendent Jurisdiction of the Federal Courts, 20 Stan. L. Rev. 262 (1968).

(1824), Mr. Chief Justice Marshall in his opinion for the Court addressed the argument that the presence in a federal lawsuit of questions which were not dependent on the construction of a law of the United States prevented the federal court from exercising Art. III jurisdiction, even in a case in which the plaintiff had been authorized by Congress to sue in federal court. Noting that "[t]here is scarcely any case, every part of which depends" upon federal law, *id.*, at 820, the Chief Justice rejected the contention:

> "If it be a sufficient foundation for jurisdiction, that the title or right set up by the party, may be defeated by one construction of the constitution or law of the United States, and sustained by the opposite construction, provided the facts necessary to support the action be made out, then all the other questions must be decided as incidental to this, which gives that jurisdiction. Those other questions cannot arrest the proceedings. . . .
>
> "We think, then, that when a question to which the judicial power of the Union is extended by the constitution, forms an ingredient of the original cause, it is in the power of congress to give the Circuit Courts jurisdiction of that cause, although other questions of fact or of law may be involved in it." *Id.*, at 822–823.

This doctrine was later applied in *Siler* v. *Louisville & Nashville R. Co.*, 213 U. S. 175 (1909), to hold that where federal jurisdiction is properly based on a colorable federal claim, the court has the "right to decide all the questions in the case, even though it decided the Federal questions adversely to the party raising them, or even if it omitted to decide them at all, but decided the case on local or state questions only." *Id.*, at 191. In *Moore* v. *N. Y. Cotton Exchange*, 270 U. S. 593, 609–610 (1926),

the Court in similar fashion sustained jurisdiction over a defendant's compulsory counterclaim arising out of the same transaction upon which the plaintiff's federal anti-trust claim was grounded, although the latter had been dismissed for failure to state a claim, and the former had no independent federal jurisdictional basis. A few years later, in *Hurn* v. *Oursler*, 289 U. S. 238 (1933), the Court drew upon the foregoing cases to establish federal jurisdiction to decide a state-law claim joined with a federal copyright infringement claim, where both were considered "two distinct grounds in support of a single cause of action," although the federal ground had proved unsuccessful. *Id.*, at 246.

In *Gibbs*, the respondent brought an action in federal court against petitioner UMW, asserting parallel claims— a federal statutory claim and a claim under the common law of Tennessee—arising out of alleged concerted union efforts to deprive him of contractual and employment relationships with the coal mine's owners. Though the federal claim was ultimately dismissed after trial, and though diversity was absent, the lower courts sustained jurisdiction over the state-law claim, and affirmed the damages award based thereon. Before reaching the merits (on which the lower courts were reversed), this Court addressed the argument that under the rule of pendent jurisdiction as set out in *Hurn* v. *Oursler*, *supra*, at 245–246, *Gibbs* had merely stated "two separate and distinct causes of action" as opposed to "two distinct grounds in support of a single cause of action," in which former case the federal court lacked the power to "retain and dispose" of the "non-federal *cause of action.*" The Court stated that since the *Hurn* test was formulated before the unification of law and equity by the Federal Rules of Civil Procedure, it was therefore un-necessarily tied to the outmoded concept of a "cause of

action" developed under code pleading rules. Recognizing that the Federal Rules themselves cannot expand federal-court jurisdiction, the Court nevertheless found in them a sufficient basis to go beyond *Hurn*'s "unnecessarily grudging" approach to parallel claims, and to adopt a more flexible treatment within the contours of Art. III, § 2. Thus, in a federal-question case, where the federal claim is of sufficient substance, and the factual relationship between "that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case,'" pendent jurisdiction extends to the state claim. 383 U. S., at 725. The Court, in the second aspect of the *Gibbs* formulation, went on to enumerate the various factors bearing on a district court's discretionary decision whether the power should be exercised in a given parallel-claims case, emphasizing that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.*, at 726.

These cases, from *Osborn* to *Gibbs*, show that in treating litigation where nonfederal questions or claims were bound up with the federal claim upon which the parties were already in federal court, this Court has found nothing in Art. III's grant of judicial power which prevented adjudication of the nonfederal portions of the parties' dispute. None of them, however, adverted to the separate question, involved in the instant case, of whether a nonfederal claim could *in turn* be the basis for joining a party over whom no independent federal jurisdiction exists, simply because that claim could be derived from the "common nucleus of operative fact" giving rise to the dispute between the parties to the federal claim.

But while none of the foregoing line of cases discussed the joining of additional parties, other decisions of this Court have developed a doctrine of "ancillary juris-

diction," and it is in part upon this development—and its relationship to *Gibbs*—that petitioner relies to support "pendent party" jurisdiction here. Under this doctrine, the Court has identified certain considerations which justified the joining of parties with respect to whom there was no independent basis of federal jurisdiction. In *Freeman* v. *Howe,* 24 How. 450 (1861), the Court held that the state court had no jurisdiction over a replevin action brought by creditor claimants to property that had already been attached by the federal marshal in a federal diversity action. The claimants argued that a want of state-court jurisdiction would leave them without a remedy, since diversity between them and the marshal was lacking. This Court stated that an equitable action in federal court by those claimants, seeking to prevent injustice in the diversity suit, would not have been "an original suit, but ancillary and dependent, supplementary merely to the original suit," and thus maintainable irrespective of diversity of citizenship. *Id.,* at 460. A similar approach was taken in *Stewart* v. *Dunham,* 115 U. S. 61 (1885), where, after a creditors' suit to set aside an allegedly fraudulent conveyance was removed to federal court on grounds of diversity, other nondiverse creditors were permitted to intervene to assert an identical interest. Since it was merely a matter of form whether the latter appeared as parties or came in later under a final decree to prove their claims before a master, the federal court "could incidentally decree in favor of [the nondiverse] creditors[, and s]uch a proceeding would be ancillary to the jurisdiction acquired between the original parties . . . ." *Id.,* at 64. *Dunham* was in turn held controlling in *Supreme Tribe of Ben-Hur* v. *Cauble,* 255 U. S. 356 (1921). There, suing in diversity, out-of-state "Class A" members of an Indiana fraternal benefit society had sought a decree adjudicating their common interests in the control and disposition of

the society's funds. After successfully defending that action, the society brought a second suit in federal court seeking to protect that judgment as against an identical state-court action brought by members of "Class A" who were of Indiana citizenship. Since under *Dunham* "intervention of the Indiana citizens in the [original] suit would not have defeated the jurisdiction already acquired," 255 U. S., at 366, the earlier judgment was binding against them, and the federal court had ancillary jurisdiction over the society's suit to enjoin the later state action, irrespective of diversity.

The doctrine of ancillary jurisdiction developed in the foregoing cases is bottomed on the notion that since federal jurisdiction in the principal suit effectively controls the property or fund under dispute, other claimants thereto should be allowed to intervene in order to protect their interests, without regard to jurisdiction.[7] As this Court stated in *Fulton Bank* v. *Hozier,* 267 U. S. 276, 280 (1925):

> "The general rule is that when a federal court has properly acquired jurisdiction over a cause it may entertain, by intervention, dependent or ancillary controversies; but no controversy can be regarded as dependent or ancillary unless it has direct re-

---

[7] As one commentator has stated:

"Once it is agreed that a state court cannot interfere with property in the control of the federal court, the notion of ancillary jurisdiction put forward in Freeman v. Howe cannot be avoided. Unless the federal court has ancillary jurisdiction to hear the claims of all persons to the property, regardless of their citizenship, some persons, with a valid claim to the property, would be deprived of any forum in which to press that claim." C. Wright, Law of Federal Courts § 9 (2d ed. 1970).

*Ben-Hur* sets out a corollary to *Howe:* ancillary jurisdiction extends to subsequent suits brought to effectuate a federal court's judgment determining the rights to such property.

lation to property or assets actually or constructively drawn into the court's possession or control by the principal suit."

The decisional bridge between these two relatively discrete lines of cases appears to be this Court's decision in *Moore*. Since the defendant's nonfederal counterclaim in *Moore* arose out of the same transaction giving rise to the antitrust dispute between the parties, and federal jurisdiction was sustained over the former, the Court in *Hurn*, though faced with a plaintiff's assertion of pendent jurisdiction over an additional nonfederal claim, thought the two cases, "in principle, cannot be distinguished." *Hurn*, 289 U. S., at 242. It was *Hurn's* "unnecessarily grudging" test of pendent jurisdiction, of course, which the Court expanded in *Gibbs*. On the other hand, because *Moore* was a suit in equity, the jurisdiction sustained there has been rationalized as falling under the umbrella of ancillary jurisdiction,[8] though *Moore* neither used that term nor cited to *Fulton Bank, supra*. Petitioner thus suggests that since *Moore*, read as an "ancillary" case, adopted a "transactional" test of jurisdiction quite similar to that set out in *Gibbs*, there is presently no "principled" distinction between the two doctrines. Since under the Federal Rules "joinder of claims, parties and remedies is strongly encouraged," *Gibbs*, 383 U. S., at 724, her use of the Rules here is as a matter of jurisdictional power assertedly limited only by whether the claim against the county "derive[s] from a common nucleus of operative fact." *Id.*, at 725. Hence, petitioner concludes, based on *Gibbs'* treatment of pendent claims, and the use of ancillary jurisdiction to

---

[8] See Shulman & Jaegerman, Some Jurisdictional Limitations on Federal Procedure, 45 Yale L. J. 393, 413 (1936); 3 J. Moore, Federal Practice ¶ 13.15 (2d ed. 1974); C. Wright, Law of Federal Courts § 9 (2d ed. 1970).

bring in additional parties, that her nonfederal claim against a nonfederal defendant falls within pendent jurisdiction since it satisfies *Gibbs'* test on its face.

For purposes of addressing the jurisdictional question in this case, however, we think it quite unnecessary to formulate any general, all-encompassing jurisdictional rule. Given the complexities of the many manifestations of federal jurisdiction, together with the countless factual permutations possible under the Federal Rules, there is little profit in attempting to decide, for example, whether there are any "principled" differences between pendent and ancillary jurisdiction; or, if there are, what effect *Gibbs* had on such differences. Since it is upon *Gibbs'* language that the lower federal courts have relied in extending the kind of pendent-party jurisdiction urged by petitioner here, we think the better approach is to determine what *Gibbs* did and did not decide; and to identify what we deem are important differences between the jurisdiction sustained in *Gibbs* and that asserted here.

*Gibbs* and its lineal ancestor, *Osborn,* were couched in terms of Art. III's grant of judicial power in "Cases . . . arising under this Constitution, the Laws of the United States, and [its] Treaties," since they (and implicitly the cases which linked them) represented inquiries into the scope of Art. III jurisdiction in litigation where the "common nucleus of operative fact" gave rise to nonfederal questions or claims between the parties. None of them posed the need for a further inquiry into the underlying statutory grant of federal jurisdiction or a flexible analysis of concepts such as "question," "claim," and "cause of action," because Congress had not addressed itself by statute to this matter. In short, Congress had said nothing about the scope of the word "Cases" in Art. III which would offer guidance on the

kind of elusive question addressed in *Osborn* and *Gibbs:* whether and to what extent jurisdiction extended to a parallel state claim against the existing federal defendant.

Thus, it was perfectly consistent with Art. III, and the particular grant of subject-matter jurisdiction upon which the federal claim against the defendant in those cases was grounded, to require that defendant to answer as well to a second claim deriving from the "common nucleus" of fact, though it be of state-law vintage. This would not be an "unfair" use of federal power by the suing party, he already having placed the defendant properly in federal court for a substantial federal cause of action. Judicial economy would also be served because the plaintiff's claims were "such that he would ordinarily be expected to try them all in one judicial proceeding . . . ." *Gibbs,* 383 U. S., at 725.

The situation with respect to the joining of a new party, however, strikes us as being both factually and legally different from the situation facing the Court in *Gibbs* and its predecessors. From a purely factual point of view, it is one thing to authorize two parties, already present in federal court by virtue of a case over which the court has jurisdiction, to litigate in addition to their federal claim a state-law claim over which there is no independent basis of federal jurisdiction. But it is quite another thing to permit a plaintiff, who has asserted a claim against one defendant with respect to which there is federal jurisdiction, to join an entirely different defendant on the basis of a state-law claim over which there is no independent basis of federal jurisdiction, simply because his claim against the first defendant and his claim against the second defendant "derive from a common nucleus of operative fact." *Ibid.* True, the same considerations of judicial economy would be served

insofar as plaintiff's claims "are such that he would ordinarily be expected to try them all in one judicial proceeding . . . ." *Ibid.* But the addition of a completely new party would run counter to the well-established principle that federal courts, as opposed to state trial courts of general jurisdiction, are courts of limited jurisdiction marked out by Congress. We think there is much sense in the observation of Judge Sobeloff, writing for the Court of Appeals in *Kenrose Mfg. Co.* v. *Fred Whitaker Co.,* 512 F. 2d 890, 894 (CA4 1972):

> "The value of efficiency in the disposition of lawsuits by avoiding multiplicity may be readily conceded, but that is not the only consideration a federal court should take into account in assessing the presence or absence of jurisdiction. Especially is this true where, as here, the efficiency plaintiff seeks so avidly is available without question in the state courts."

There is also a significant legal difference. In *Osborn* and *Gibbs* Congress was silent on the extent to which the defendant, already properly in federal court under a statute, might be called upon to answer nonfederal questions or claims; the way was thus left open for the Court to fashion its own rules under the general language of Art. III. But the extension of *Gibbs* to this kind of "pendent party" jurisdiction—bringing in an additional defendant at the behest of the plaintiff—presents rather different statutory jurisdictional considerations. Petitioner's contention that she should be entitled to sue Spokane County as a new third party, and then to try a wholly state-law claim against the county, all of which would be "pendent" to her federal claim against respondent county treasurer, must be decided, not in the context of congressional silence or tacit encouragement, but in

quite the opposite context. The question here, which it was not necessary to address in *Gibbs* or *Osborn,* is whether by virtue of the statutory grant of subject-matter jurisdiction, upon which petitioner's principal claim against the treasurer rests, Congress has addressed itself to the *party* as to whom jurisdiction pendent to the principal claim is sought. And it undoubtedly has done so.

### III

Congress has in specific terms conferred Art. III jurisdiction on the district courts to decide actions brought to redress deprivations of civil rights. Under the opening language of § 1343,[9] those courts "shall have original jurisdiction of any *civil action authorized by law* to be commenced by any person . . ." (emphasis added). The civil rights action set out in § 1983 [10] is, of course, included within the jurisdictional grant of subsection (3) of § 1343. Yet petitioner does not, and indeed could not, contest the fact that as to § 1983, counties are excluded from the "person[s]" answerable to the plaintiff "in an action at law [or] suit in equity" to redress the enumerated deprivations.[11] Petitioner must necessarily argue that in spite of the language emphasized above Congress left it open for the federal courts to fashion a jurisdictional doctrine under the general language of Art. III enabling them to circumvent this exclusion, as long as the civil rights action and the state-law claim arise from a "common nucleus of operative fact." But the question whether jurisdiction over the instant lawsuit extends not only to a related state-law claim, but to the defendant against whom that claim is made, turns initially, not on the general

---

[9] See n. 3, *supra.*

[10] See n. 2, *supra.*

[11] *Monroe* v. *Pape,* 365 U. S. 167, 187–191 (1961); *City of Kenosha* v. *Bruno,* 412 U. S. 507, 511–513 (1973).

contours of the language in Art. III, *i. e.,* "Cases . . . arising under," but upon the deductions which may be drawn from congressional statutes as to whether Congress wanted to grant this sort of jurisdiction to federal courts. Parties such as counties, whom Congress *excluded* from liability in § 1983, and therefore by reference in the grant of jurisdiction under § 1343 (3), can argue with a great deal of force that the scope of that "civil action" over which the district courts have been given statutory jurisdiction should not be so broadly read as to bring them *back* within that power merely because the facts also give rise to an ordinary civil action against them under state law. In short, as against a plaintiff's claim of *additional* power over a "pendent party," the reach of the statute conferring jurisdiction should be construed in light of the scope of the cause of action as to which federal judicial power *has* been extended by Congress.

Resolution of a claim of pendent-party jurisdiction, therefore, calls for careful attention to the relevant statutory language. As we have indicated, we think a fair reading of the language used in § 1343, together with the scope of § 1983, requires a holding that the joinder of a municipal corporation, like the county here, for purposes of asserting a state-law claim not within federal diversity jurisdiction, is without the statutory jurisdiction of the district court.[12]

---

[12] The floor debates on the statute which became § 1983, relied upon by our Brother BRENNAN, insofar as any common understanding may be distilled from their diverse strains, indicate a recognition of the authority of United States courts to entertain suits against municipal corporations under their then-existing diversity jurisdiction. It is, of course, a fair inference from this theme that nothing in § 1983 or § 1343 was intended to disturb such jurisdiction, and it seems scarcely necessary to add that nothing we say in this opinion disturbs it in the slightest. All that we hold is that where the asserted basis of federal jurisdiction over a municipal

18

There are, of course, many variations in the language which Congress has employed to confer jurisdiction upon the federal courts, and we decide here only the issue of so-called "pendent party" jurisdiction with respect to a claim brought under §§ 1343 (3) and 1983. Other statutory grants and other alignments of parties and claims might call for a different result. When the grant of jurisdiction to a federal court is exclusive, for example, as in the prosecution of tort claims against the United States under 28 U. S. C. § 1346, the argument of judicial economy and convenience can be coupled with the additional argument that *only* in a federal court may all of the claims be tried together.[13]   As we indicated at the outset of this opinion, the question of pendent-party jurisdiction is "subtle and complex," and we believe that it would be as unwise as it would be unnecessary to lay down any sweeping pronouncement upon the existence or exercise of such jurisdiction. Two observations suffice for the disposition of the type of case before us. If the new party sought to be joined is not otherwise subject to federal jurisdiction, there is a more serious obstacle to the exercise of pendent jurisdiction than if parties already before the court are required to litigate a state-law claim. Before it can be concluded that such jurisdiction exists, a federal court must satisfy itself not only that Art. III permits it, but that Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence.

corporation is not diversity of citizenship, but is a claim of jurisdiction pendent to a suit brought against a municipal officer within § 1343, the refusal of Congress to authorize suits against municipal corporations under the cognate provisions of § 1983 is sufficient to defeat the asserted claim of pendent-party jurisdiction.

[13] See, *e. g., Hipp* v. *United States,* 313 F. Supp. 1152 (EDNY 1970).   Contra, *Williams* v. *United States,* 405 F. 2d 951 (CA9 1969).

We conclude that in this case Congress has by implication declined to extend federal jurisdiction over a party such as Spokane County. The judgment of the Court of Appeals for the Ninth Circuit is therefore

*Affirmed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL and MR. JUSTICE BLACKMUN join, dissenting.

*Mine Workers* v. *Gibbs,* 383 U. S. 715, 725–726 (1966), held:

"Pendent jurisdiction, in the sense of judicial *power,* exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ,' U. S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. . . . The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

"That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exer-

cise jurisdiction over state claims, even though bound to apply state law to them." (Footnotes omitted.)

I

*Gibbs* concerned a state-law claim jurisdictionally pendent to one of federal law, but no reason appears why the identical principles should not equally apply to pendent state-law claims involving the joinder of additional parties. In either case the Art. III question concerns only the subject matter and not the *in personam* jurisdiction of the federal courts. In either case the question of Art. III power in the federal judiciary to exercise subject-matter jurisdiction concerns whether the claims asserted are such as "would ordinarily be expected to [be tried] in one judicial proceeding," and the question of discretion addresses "considerations of judicial economy, convenience and fairness to litigants." [1]

To recognize that the addition of parties under the pendent jurisdiction of the federal courts will sometimes alter the balance of "judicial economy, convenience and fairness," or sometimes threaten to embroil federal courts in the resolution of uncertain questions of state law, and thereby make the exercise of this discretionary jurisdiction inappropriate, is only to speak to the question

---

[1] This has been the holding of the Court of Appeals for the Second Circuit in a series of opinions by Judge Friendly. *Almenares* v. *Wyman*, 453 F. 2d 1075 (1971); *Leather's Best, Inc.* v. *S. S. Mormaclynx*, 451 F. 2d 800 (1971); *Astor-Honor, Inc.* v. *Grosset & Dunlap, Inc.*, 441 F. 2d 627 (1971); *United States* v. *Heyward-Robinson Co.*, 430 F. 2d 1077 (1970) (concurring opinion). See also 7 C. Wright & A. Miller, Federal Practice and Procedure § 1659 (1972); Fortune, Pendent Jurisdiction—The Problem of "Pendenting Parties," 34 U. Pitt. L. Rev. 1 (1972); Note, UMW v. Gibbs and Pendent Jurisdiction, 81 Harv. L. Rev. 657 (1968); Comment, Pendent and Ancillary Jurisdiction: Towards a Synthesis of Two Doctrines, 22 U. C. L. A. L. Rev. 1263 (1975).

of the proper exercise of judicial discretion in the circumstances and does not vitiate the *Gibbs* analysis or its application to the question of pendent-party jurisdiction. To fail to recognize the applicability of *Gibbs* to the situation of pendent parties as well as claims would often compel a result aptly described by the Court of Appeals for the Eighth Circuit:

> " '[I]t would be an unjustifiable waste of judicial and professional time—indeed, a travesty on sound judicial administration—to allow plaintiff to try his [federal and state claims against certain codefendants] in Federal court but to require him to prosecute a claim involving precisely the same facts against [a codefendant joined pursuant only to the pendent state-law claim] in a State court.' " *Schulman* v. *Huck Finn, Inc.*, 472 F. 2d 864, 866 (1973) (quoting 350 F. Supp. 853, 858 (Minn. 1972)).

In upholding an exercise of pendent-party jurisdiction under *Gibbs* principles in that case, the Court of Appeals reaffirmed, 472 F. 2d, at 867, an earlier decision of that court by my Brother BLACKMUN, *Hatridge* v. *Aetna Cas. & Surety Co.*, 415 F. 2d 809 (1969). Therein my Brother BLACKMUN, applying *Gibbs* principles in finding appropriate the exercise of federal pendent-party jurisdiction, set forth an analysis with which I am in complete accord:

> "[In] appropriate cases [pendent-party jurisdiction] makes good sense; it avoids forum shopping and multiple actions; it tends to reduce costs for litigants; and it avoids the waste of already heavily burdened judicial time." *Id.*, at 817.

## II

The Court today does not disclaim the applicability of *Gibbs* to the question of federal pendent-party juris-

diction. Rather, recognizing *sub silentio* the absurd results it would create by a disclaimer of the possibility of federal pendent-party jurisdiction—whether under the label of "ancillary" jurisdiction or that of "pendent party," see *Moor* v. *County of Alameda,* 411 U. S. 693, 714–715 (1973)—in a variety of possible contexts under various jurisdictional statutes and the Federal Rules of Civil Procedure,[2] the Court declines "to lay down any sweeping pronouncement upon the existence or exercise of such jurisdiction." *Ante,* at 18. The Court instead reaches its result—the proclamation of a *per se* rule forbidding pendent jurisdiction over claims arising under state law against local governmental units when joined with a § 1983 claim even where such claims "derive from a common nucleus of operative fact"—by purporting to find that "in this case Congress has by implication" expressed its disapproval of federal pendent-party jurisdiction "over a party such as Spokane County." *Ante,* at 19. That result is demonstrably untenable.

The Court seeks to justify its *per se* rule by analysis of the congressional will as expressed in the federal statutes involved—28 U. S. C. § 1343 (3) and 42 U. S. C. § 1983.[3] The test the Court announces is "whether by

---

[2] As, for example, where a defendant seeks to join under Fed. Rule Civ. Proc. 14 a third-party defendant over whom there is no independent subject-matter jurisdiction. The analysis in *Gibbs* placed emphasis on the fact that the Federal Rules "embody 'the whole tendency of our decisions . . . to require a plaintiff to try his . . . whole case at one time,' . . . and to that extent emphasize the basis of pendent jurisdiction." 383 U. S., at 725 n. 13. The Federal Rules directly encourage the joinder of parties as well as claims. *E. g.,* Fed. Rules Civ. Proc. 13 (h), 14, 19, 20, 22, 24, and 25.

[3] I agree, of course, that Congress may preclude the exercise of pendent-party jurisdiction as to particular parties or particular types of claims and that congressional determination would be binding on

virtue of the statutory grant of subject-matter jurisdiction, upon which petitioner's principal claim . . . rests, Congress has addressed itself to the *party* as to whom jurisdiction pendent to the principal claim is sought." *Ante,* at 16. At one level of analysis, this test is of course meaningless, being capable of application to *all* cases, because all instances of asserted pendent-party jurisdiction will by definition involve a party as to whom Congress has impliedly "addressed itself" by not expressly conferring subject-matter jurisdiction on the federal courts. But, the Court says, it is drawing "deductions . . . from [the] congressional statutes as to whether Congress wanted to grant this sort of jurisdiction to federal courts," *ante,* at 17, and it "conclude[s] that in this case Congress has by implication declined." *Ante,* at 19. It is apparent, however, that analysis of the statutory enactments involved, their legislative history, and the congressional policies embodied therein belies the Court's assertion that its purported test for determining the propriety of pendent-party jurisdiction yields the result reached today.

## A

The purely jurisdictional statute involved in this case, 28 U. S. C. § 1343 (3), in no way speaks to the issue of pendent-party jurisdiction in respect to joinder of defendants under pendent state-law claims. On its face that statute speaks only to jurisdiction over civil actions

---

this Court. It is worthy of note, however, that Congress has not in the past expressed disapproval of our developments in the law of pendent and ancillary jurisdiction, and "[t]he only congressional enactments on this subject have, in fact, extended rather than restricted ancillary jurisdiction in a number of situations." Baker, Toward a Relaxed View of Federal Ancillary and Pendent Jurisdiction, 33 U. Pitt. L. Rev. 759, 763 (1972).

"authorized by law to be commenced by any person," and plainly does not address the question of what parties shall be joined as defendants. Accordingly, the Court necessarily argues its proposition from "the scope of the cause of action," *ante,* at 17, created by § 1983. But the legislative history of that enactment plainly gives no support to the Court's argument that Congress by implication intended to preclude the exercise of federal jurisdiction over state-law claims against local governmental units where such jurisdiction would otherwise lie under application of standard principles.

Our precedents, *Monroe* v. *Pape,* 365 U. S. 167 (1961), and *Moor* v. *County of Alameda, supra,* firmly establish that the sole rationale for construing the "persons" susceptible of liability under § 1983 as excluding local units of government lies in the legislative history of the so-called Sherman Amendment to the Act of April 20, 1871, § 1 of which enacted into law the first version of the present § 1983.[4] The Senate approved one version of the Amendment proposed by Senator Sherman which would have expressly provided for local governmental liability,[5] and the House rejected it.[6] The Conference Committee reported another version [7] and the House rejected the Conference Report.[8] Thereafter, the Senate acceded to the House rejection of the Sherman Amendment and both Houses substituted in its place § 6 of the 1871 Act, the first version of the present 42 U. S. C. § 1986.[9] The rejection of the Sherman Amendment, and nothing more, has been the basis upon which we have

---

[4] Cong. Globe, 42d Cong., 1st Sess., App. 335 (1871).

[5] *Id.,* at 704–705.

[6] *Id.,* at 725.

[7] *Id.,* at 749.

[8] *Id.,* at 800–801.

[9] *Id.,* at 804.

construed § 1983 liability as not encompassing local governmental units. *Monroe* v. *Pape, supra,* at 188–191; *Moor* v. *County of Alameda,* 411 U. S., at 707–710. But as those cases recognize, the reason for the House rejection of the Amendment, as stated by Mr. Poland, House Manager of the Conference Committee Report, was that "the House had solemnly decided that in their judgment Congress had no constitutional power to *impose any obligation* upon county and town organizations, the mere instrumentality for the administration of State law." Cong. Globe, 42d Cong., 1st Sess., 804 (1871) (emphasis supplied). See *Monroe* v. *Pape, supra,* at 190; *Moor* v. *County of Alameda, supra,* at 708. This judgment of the House respecting its lack of constitutional power to "impose . . . liability" "as a matter of federal law," *id.,* at 710 n. 27 (emphasis in original), on local governmental units pervades the legislative history of the aborted Sherman Amendment.[10]

In marked contrast in the legislative history of that proposed Amendment, however, is the absence of expression of hostility to federal judicial forums entertaining claims arising under state law. The opponents of the Sherman Amendment were, as the legislative history reveals, fully aware of several existing state laws respecting local government tort liability.[11] Moreover, the opponents of the proposed Amendment, who consistently objected to the imposition of liability upon local governmental units as a matter of substantive federal law, also consistently expressed their views respecting the enter-

---

[10] *Id.,* at 788 (remarks of Mr. Kerr); *id.,* at 791 (remarks of Mr. Willard); *id.,* at 793 (remarks of Mr. Poland); *id.,* at 795 (remarks of Mr. Blair); *ibid.* (remarks of Mr. Burchard); *id.,* at 799 (remarks of Mr. Farnsworth).

[11] *Id.,* at 792 (Mass.); *id.,* at 799 (N. Y.); *id.,* at 800 (Pa.); *ibid.* (Ky.).

tainment in federal forums of state-law claims against local governmental units.

"[M]y colleague on this committee says that it is a common practice for the courts of the United States, in the exercise of the judicial powers granted to them in the Constitution, to enforce the performance of judgments against municipalities of this kind, such as counties and cities. I answer him that he, as well as any other intelligent lawyer of this House, well knows that that proposition is true to this extent only, that *the Federal courts in the exercise of this grant of judicial powers may, where they have the jurisdiction under the Constitution, compel these municipalities to execute their contracts, and that is all.* To execute their contracts; but let it be remembered that no decree of a Federal court has gone to the extent of saying that any one of these divisions should execute its own contracts *except in precise compliance with the law of the State, in precise accordance with its own contract and the law upon which it was based, and not in pursuance of any law dictated to it by Congress. In other words, the extent of judicial power hitherto exercised in that direction has been confined to the execution of civil contracts,* such as the payment of corporation and municipal bonds issued under State authority, *where the courts of the United States had jurisdiction, and then only according to the law of the State recognizing and enforcing fully and kindly, and in all respects within the precise letter of the Constitution, the right of the State to govern itself,* to regulate its municipal interests, to say whether a county or State may subscribe to a railroad, may issue or put out bonds and securities in a particular way, how those securities may be made payable and their

payment made certain. *If any county or city fails to perform its obligations its contracts can be enforced.*" Cong. Globe, 42d Cong., 1st Sess., 789 (1871) (remarks of Mr. Kerr) (emphasis supplied).

"The gentleman from Ohio [Mr. Shellabarger] said this morning that the Supreme Court has decided in favor of this power on the part of Congress. It has done no such thing. Where a State has authorized a city or county to make a contract, and when, under the law of the State, they have made a contract binding themselves, the Supreme Court of the United States has said that they were liable to be sued for the enforcement of that contract. That is all the Supreme Court of the United States have [*sic*] ever decided in regard to the liability of municipal corporations. When the State which created them has authorized them to bind themselves by a contract, and they have done so, the court has very properly said that the courts were open for the enforcement of such contracts, as for enforcing the contracts of other parties. *I PRESUME, TOO, THAT WHERE A STATE HAD IMPOSED A DUTY UPON SUCH MUNICIPALITY, AND PROVIDED THEY SHOULD BE LIABLE FOR ANY DAMAGES CAUSED BY FAILURE TO PERFORM SUCH DUTY, THAT AN ACTION WOULD BE ALLOWED TO BE MAINTAINED AGAINST THEM IN THE COURTS OF THE UNITED STATES UNDER THE ORDINARY RESTRICTIONS AS TO JURISDICTION. But the enforcing a liability, existing by their own contract, or by a State law, in the courts, is a very widely different thing from devolving a new duty or liability upon them by the national Government,* which has no power either to create or destroy them,

and no power or control over them whatever." *Id.*, at 794 (remarks of Mr. Poland) (emphasis supplied).

"Congress has never asserted or attempted to assert, so far as I know, any such authority. That amendment claims the power in the General Government to go into the States of this Union and lay such obligations as it may please upon the municipalities, which are the creations of the States alone. Now, sir, that is an exceedingly wide and sweeping power. I am unable to find a proper foundation for it. Though I am not disposed here and now to discuss it very minutely, I wish to say that thus far I am unable to see where the authority can rest. I listened with the utmost respect, and with all the attention in my power, to the argument of the gentleman from Ohio, [Mr. Shellabarger,] the chairman of the committee of conference, to see if I could ascertain just where he placed it, and I think I shall do him no wrong when I say that he wholly failed to show the House where the power resides. He did undertake to find some parallel in other action of the judiciary of the United States toward these municipalities, growing out of contracts; but, sir, *when a municipality, under the authority given by a State, makes a contract it thereby lays itself liable to every remedy upon that contract, and it is liable to be sued by its own consent, and with the consent of the State that created it, in any court having jurisdiction of the subject matter of that contract.*

"*This we all understand very well; but here it is proposed, not to carry into effect an obligation which rests upon the municipality, but to create that obligation, and that is the provision I am un-*

*able to assent to."* *Id.,* at 795 (remarks of Mr. Blair) (emphasis supplied).

". . . [I]n the first place, I wish to remark that the decisions that have been referred to, those of Knox *vs.* Lee county and the others, go to this extent only, if I understand rightly their scope: that *where a State imposes a duty upon county officers or State municipal corporations, the exercise of which is necessary to give effect to judgments or decrees of the United States courts, the latter can enforce the performance of that duty.* In other words, where by the laws of a State the board of supervisors of a county, or the common council of a city, are authorized to levy a tax and collect funds to pay a judgment, for the purpose of enforcing satisfaction of the judgment, the United States court, by *mandamus* can compel those State officers, those officers of a municipal corporation, to perform that duty.

"But there is no duty imposed by the Constitution of the United States, or usually by State laws, upon a county to protect the people of that county against the commission of the offenses herein enumerated, such as the burning of buildings or any other injury to property or injury to person. Police powers are not conferred upon counties as corporations; they are conferred upon cities that have qualified legislative power. *AND SO FAR AS CITIES ARE CONCERNED, WHERE THE EQUAL PROTECTION REQUIRED TO BE AFFORDED BY A STATE IS IMPOSED UPON A CITY BY STATE LAWS, PERHAPS THE UNITED STATES COURTS COULD ENFORCE ITS PERFORMANCE."* *Ibid.* (remarks of Mr. Burchard) (emphasis supplied).[12]

---

[12] I can find only one expression of hostility to the federal courts—

It is difficult to imagine a clearer recognition by opponents of extension of liability under federal law to a "person" of the difference between the application of federal substantive law to a given party and the entertainment of state-law claims respecting that party in federal court, or an instance where the legislative action is more clearly premised upon that distinction. Although the Court purports to be "deduc[ing]" the expressed congressional will as manifested in statutes and their legislative history, today's result is wholly belied by these crystal-clear expressions.

## B

Today's result not only is insupportable under the Court's purported test for ascertaining the propriety of pendent-party jurisdiction in the federal courts, but,

and that ambiguous in its context—in the entire legislative history of the proposed Sherman Amendment:

"I care comparatively little about the Sherman amendment, either in its original or modified form. It is too grossly and palpably unconstitutional to receive the sanction of any court that even a Radical President or Senate might organize. The Supreme Court, thank God, has yet a decent respect for constitutional liberty and law, and it will dismiss with the contempt it merits the first case that comes before it seeking to enforce the judgments provided for in this bill, and that will be an end of the Sherman amendment. Therefore, I am not afraid of the practical effect of that piece of narrow-minded, fanatical, and malicious legislation; it overleaps itself. The old English 'hue and cry,' or any other relic of barbarism, cannot save it.

"Our written Constitution, its limitations and restrictions, were intended to put an end forever to the exercise of all such legislative and judicial authority by the Federal Government, and leave all these matters to the several States and the people thereof. I care nothing about the minor charges, but I do protest against the continuance and application of the law of July 17, 1862, to the numerous classes of cases provided for in the proposed bill." *Id.*, at 789–790 (remarks of Mr. Beck).

more importantly, it wholly disregards the congressional intent and policy in enacting the various Civil Rights Acts including the present § 1983. For, to an extent perhaps unparalleled in our history, the post-Civil War Civil Rights Acts had as a focal point the provision that claims brought under those Acts should be entertained in federal judicial forums. The Civil Rights Acts were enacted in an era of "national feeling born of the Civil War. Nationalism was triumphant; in national administration was sought its vindication." F. Frankfurter & J. Landis, The Business of the Supreme Court 64 (1928). Contemporaneous with the passage of the Civil Rights Acts was the Act of March 3, 1875, which, in conferring general federal-question jurisdiction upon the federal courts, thereby made those courts "the primary and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States." *Id.*, at 65; *Zwickler* v. *Koota,* 389 U. S. 241, 247 (1967). "In thus expanding federal judicial power, Congress imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims." *Id.*, at 248.

Although there has been disagreement among us upon the question of the precise scope of § 1983, none of us has heretofore denied "the fact that a powerful impulse behind the creation of [§ 1983] *was the purpose that it be available in, and be shaped through, original federal tribunals,*" or has forgotten *"how important providing a federal trial court was among the several purposes of the Ku Klux Act."* *Monroe* v. *Pape,* 365 U. S., at 252, 251 (Frankfurter, J., dissenting) (emphasis supplied).[13]

"The predecessor of § 1983 was . . . an important

---

[13] "See the remarks of Mr. Dawes, a member of the Committee

32

part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment. As a

which reported the Ku Klux bill, [Cong. Globe, 42d Cong., 1st Sess.] 476:

" 'The first remedy proposed by this bill is a resort to the courts of the United States. Is that a proper place in which to find redress for any such wrongs? If there be power to call into the courts of the United States an offender against these rights, privileges, and immunities, and hold him to an account there, either civilly or criminally, for their infringement, I submit to the calm and candid judgment of every member of this House that there is no tribunal so fitted, where equal and exact justice would be more likely to be meted out in temper, in moderation, in severity, if need be, but always according to the law and the fact, as that great tribunal of the Constitution.'

"And see, *e. g.*, the remarks of Mr. Coburn, *id.*, at 459–460:

" 'Whenever, then, there is a denial of equal protection by the State, the courts of justice of the nation stand with open doors, ready to receive and hear with impartial attention the complaints of those who are denied redress elsewhere. Here may come the weak and poor and downtrodden, with assurance that they shall be heard. Here may come the man smitten with many stripes and ask for redress. Here may come the nation, in her majesty, and demand the trial and punishment of offenders, when all, all other tribunals are closed. . . .

" 'Can these means be made effectual? Can we thus suppress these wrongs? I will say we can but try. The United States courts are further above mere local influence than the county courts; their judges can act with more independence, cannot be put under terror, as local judges can; their sympathies are not so nearly identified with those of the vicinage; the jurors are taken from the State, and not the neighborhood; they will be able to rise above prejudices or bad passions or terror more easily. The marshal, clothed with more power than the sheriff, can make arrests with certainty, and, with the aid of the General Government, can seize offenders in spite of any banded and combined resistance such as may be expected. Thus, at least, these men, who disregard all law, can be brought to trial. Here we stop. The court is to do the rest, acting under all its solemn obligations of duty to country

result of the new structure of law that emerged in the post-Civil War era—and especially of the Fourteenth Amendment, which was its centerpiece—the role of the Federal Government as a guarantor of basic federal rights against state power was clearly established. . . . Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation." *Mitchum* v. *Foster*, 407 U. S. 225, 238–239 (1972) (footnotes omitted).

An extensive review of the legislative history of § 1983 in *Monroe* v. *Pape, supra,* at 173–180, led this Court to conclude:

"It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies." 365 U. S., at 180; *id.,* at 193 (Harlan, J., concurring).

Review of that same legislative history in *Mitchum* v. *Foster, supra,* at 238–242,[14] led us to proclaim it

---

and God. Can we trust it, or are we afraid of our own institutions? Does the grim shadow of the State step into the national court, like a goblin, and terrify us? Does this harmless and helpless ghost drive us from that tribunal—the State that mocks at justice, the State that licenses outlawry, the State that stands dumb when the lash and the torch and the pistol are lifted every night over the quiet citizen? We believe that we can trust our United States courts, and we propose to do so.' " *Monroe* v. *Pape,* 365 U. S., at 253–254, n. 83 (Frankfurter, J., dissenting).

[14] *E. g.:*

"As Representative Lowe stated, the 'records of the [state]

"evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts.

> .        .        .        .        .

"Section 1983 was thus a product of a vast transformation from the concepts of federalism that had prevailed in the late 18th century . . . . The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.' " 407 U. S., at 242.

But by the announcement of its *per se* rule today, the Court undermines past teachings that the availability of a federal forum for claims brought pursuant to § 1983 is crucially important, and in one fell swoop erases the leg-

---

tribunals are searched in vain for evidence of effective redress [of federally secured rights] . . . . What less than this [the Civil Rights Act of 1871] will afford an adequate remedy? The Federal Government cannot serve a writ of mandamus upon State Executives or upon State courts to compel them to protect the rights, privileges and immunities of citizens . . . . The case has arisen . . . when the Federal Government must resort to its own agencies to carry its own authority into execution. Hence this bill throws open the doors of the United States courts to those whose rights under the Constitution are denied or impaired.' Cong. Globe, 42d Cong., 1st Sess., 374–376 (1871)." *Mitchum* v. *Foster,* 407 U. S., at 240.

islative intent that those teachings reflect.[15]  After today, a suitor seeking redress in a federal forum under § 1983 and redress for the same wrongs under state law must split his case, and he is remitted to duplicative litigation no matter how expensive, wasteful, and needless. Regardless of the balance of the discretionary factors enunciated in *Gibbs;* regardless of the clarity of state law respecting the pendent claim against the local governmental unit, cf. Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216, 232–233 (1948);[16] regardless of the absolute

---

[15] See Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216, 230 (1948):

"[I]n [the] instance [of] the rights of action specially conferred by Congress in the Civil Rights Laws. . . .  Congress has declared the historic judgment that within this precious area, often calling for a trial by jury, there is to be no slightest risk of nullification by state process.  The danger is unhappily not past.  It would be moving in the wrong direction to reduce the jurisdiction in this field—not because the interest of the state is smaller in such cases, but because its interest is outweighed by other factors of the highest national concern."  (Footnote omitted.)

[16] "There is a vice in federal adjudication on state grounds inhering in the fact that federal courts are not the authorized expositors of state law; there is no mechanism by which their errors in such matters can be corrected on appeal by state courts.  There is a vice also, as we have recognized by liberal rules of joinder, in forcing plaintiffs who have multiple bases of action to pursue their remedies in pieces and in different courts.  It is, however, possible to find a balance for these evils.  The balance is achieved if jurisdiction is extended generally to claims that under joinder rules may be asserted in a single action, subject to discretion in the court to dismiss without prejudice claims resting upon state law. When uncertainty obtains as to prevailing local doctrine, when that doctrine is enmeshed in clashing policies that render any legal formulation an intrinsically changing concept, the discretion would

identity of factual issues between the two claims, see Kates & Kouba, Liability of Public Entities Under Section 1983 of the Civil Rights Act, 45 S. Cal. L. Rev. 131, 162–163 (1972); regardless of the monetary expense and other disadvantages of duplicate litigation, see Fortune, Pendent Jurisdiction—The Problem of "Pendenting Parties," 34 U. Pitt. L. Rev. 1, 8–9 (1972); regardless of the waste of judicial time and the "travesty on sound judicial administration," *supra,* at 21, the Court by its *per se* rule forces upon a litigant the indefensible choice of either suffering the costs of duplicate litigation or forgoing his right, a right emphatically emphasized in the congressional policy, to a federal forum in which to be heard on his federal claim. To say that the suitor has available a state forum in which conveniently to litigate both his claims, *ante,* at 15,[17] is patently to ignore the real issue, for it is painfully obvious that this does not result in a neutral choice by the suitor among available forums; rather it imparts a fundamental bias against utilization of the federal forum owing to the deterrent effect imposed by the needless requirement of duplicate litigation if the federal forum is chosen. P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 922–923 (2d ed. 1973). Accordingly, rather than

---

be exercised to limit federal adjudication to the federal grounds. When, on the contrary, the issue turns on principles well settled by the state, the federal courts can safely undertake the full adjudication of the case." *Id.,* at 232–233 (footnotes omitted).

[17] The Court today appears to decide *sub silentio* a hitherto unresolved question by implying that § 1983 claims are not claims exclusively cognizable in federal court but may also be entertained by state courts. See *ante,* at 15, 18. This is a conclusion with which I agree.

paying "due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims," *Zwickler* v. *Koota,* 389 U. S., at 248, the Court today rides roughshod over this congressionally imposed duty and reaches a result that flies in the face of the expressed congressional intent.   I dissent.