## Richmond

WANDA SPICER PAGE

V.

GILBERT R. ARNOLD, ET AL.

Record No. 811433.

March 9, 1984.

Present: All the Justices.

*Thomas V. Monahan (James H. Laughlin; Hall, Monahan, Engle, Mahan & Mitchell; Benoit, Smith & Laughlin*, on briefs), for appellant.

*J. Sloan Kuykendall (Kuykendall, Wetsel & Kuykendall, P.C.*, on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

This is the appeal of a negligence action brought by one injured when the motor vehicle in which she was riding collided with a pony that was at large on a public highway.

On April 8, 1978, around 7:45 p.m., appellant Wanda Spicer Page was a passenger in a 1973 Toyota automobile operated by her husband, Andrew Jackson Page, eastbound on Route 50 in Frederick County, east of Winchester. The vehicle struck a Chincoteague pony owned by 20-year-old Jennifer Arnold, now Mrs. Racey. The pony had been confined in a fenced pasture adjacent to the highway. The pasture was under the control of Gilbert R. Arnold, Jennifer's father, under a written agreement with the owner of the real estate. In the accident, the pony was killed and Mrs. Page was injured seriously.

Mrs. Page sued her husband and the Arnolds. At the conclusion of the plaintiff's evidence, the trial court sustained the Arnolds' motion to strike the evidence; a similar motion made by the husband was overruled. The jury found for the husband and the trial court entered judgment in favor of the three defendants. The plaintiff appeals as to the Arnolds only.

The sole issue on review deals with primary negligence and proximate cause. The plaintiff contends the fence surrounding the pasture was of insufficient height properly to contain the pony.

▪ Because the trial court struck the plaintiff's evidence, the sufficiency of that evidence to sustain a recovery is challenged. Thus, we will view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the plaintiff. *Mason and Dixon, Inc.* v. *United States Casualty Co.*, 199 Va. 221, 222, 98 S.E.2d 702, 703 (1957). *Accord Jones* v. *Downs*, 222 Va. 25, 28, 278 S.E.2d 799, 800 (1981).

At the scene, Route 50 was a four-lane, divided highway. Two eastbound and two westbound lanes were separated by a 12-foot median. The road was straight; the highway surface was dry; the weather was clear; and it was dark. There was no artificial lighting in the immediate area, which was in open country.

The Page vehicle was being driven uphill in the left, east-bound lane. Suddenly, the plaintiff's husband observed the unattended pony standing near the center of the eastbound lanes. Page "steered" to the left and applied the brakes, but was unable to avoid the animal. The right front of the vehicle collided with the pony, causing it to be thrown into the windshield and roof of the car.

The pony was a two-year-old filly. Her mane and tail were black. Her body was reddish-brown. According to the testimony, she stood about 13 hands, or 52 inches, high.

After the accident, the investigating police officer examined the fence that enclosed the pasture where the pony had been kept. He viewed the fence the night of the accident and again the following morning, finding no "breaks" on either occasion. The officer testified the top of the fence came "approximately" to his waist, three feet and one-half inch above the ground.

The officer discussed the incident with Jennifer's father during the morning after the accident. He asked Arnold if the pony "could have jumped the fence." Arnold replied that "it was possible." Arnold said that the pony was a "jumper and she had been training him." Later, the officer testified that Arnold said: "It was possible that it could have jumped. He didn't state that it did. It was possible."

According to the testimony of the Arnolds, elicited from them as adverse witnesses, up to 200 head of cattle formerly had been kept in the field in question. Either five months or two months before the accident, the Arnolds moved horses to the field, which then was empty of other livestock. Maintained in the pasture were four horses, one owned by Arnold and three owned by Jennifer.

The fence around the pasture was "American wire on the bottom and barbed wire on the top." Arnold measured the fence after the accident. He found the American wire to be 48 inches high, with one strand of barbed wire 8 inches above, for a total height of 56 inches above the ground "all the way around" the field. Jennifer estimated the height of the fence as "[j]ust under five feet."

Access to the pasture was through two gates. One gate, located near the highway, was closed with a chain lock; Arnold had the only key. The other gate, heavy and wooden, was near a barn, away from the highway. That gate was closed by use of a wire; the gate was pulled "shut" and wired "until it hooks."

Jennifer had acquired a mare and its filly, the pony in question, about 18 months before the accident. The filly had not been weaned from its mother, even though it was beyond the normal age for weaning, because the Arnolds did not have another field to "cut her out in." At the time of the accident, the filly "still nursed off" the mare; they "didn't like to be separated." Jennifer "never saw either one of them very far apart." The pony, like the mare, had a quiet and gentle disposition; "she just liked being loved and petted." Because of the filly's quiet disposition, Jennifer permitted children to ride the pony.

Jennifer testified that the pony never had a saddle or bridle on her and that she had not trained the animal to jump; to her knowledge, the pony had never jumped. At the time of the accident, the filly had not been on a regular training schedule; Jennifer had been spending "a couple of hours" weekly, for several months, teaching her to follow a leader, using only a halter and a lead line.

The testimony revealed that the Arnolds habitually examined the fence and the gates. Vandals had never tampered with the enclosure, and no one had threatened the Arnolds; no person had "bothered" the property or the horses, and the Arnolds never "had any trouble with the horses getting out of that field" prior to the date of the accident. About a week before the accident, Jennifer rode around the fence that enclosed the field and found it in "perfect" condition.

Around 5:30 p.m. on the day of the accident, Jennifer fed the horses. She entered the pasture through the gate near the barn. She remained in the lot while the animals ate. After consuming the feed, they "filtered back up into the field" to the top of a hill where there was "lush grass" and "a large bed of clover" for "good grazing." When Jennifer left the field, she closed the gate and "wired it shut."

Jennifer learned of the accident the following morning, examined the barn gate, and found it "completely closed and wired shut"; it was "the same way [she] had left it" the previous day. She did not examine the gate near the highway "because it had been chained shut with a lock." Arnold also learned of the accident the following morning. He found the gate near the highway chained and locked "identical to the way" he had left it. He found the barn gate closed and "wired tight."

The plaintiff's husband also examined the fence after the accident. He testified that the height was 47 ¼ inches with "one strand of barbed wire . . . laying down on the top of the other fence."

The plaintiff argues on appeal, as in the trial court, that she produced evidence sufficient to establish a jury issue. She based her argument on Arnold's testimony as to the pony's jumping ability. The plaintiff contends the jury should have been permitted to find that the filly had the ability to jump a fence 56 inches in height, but the Arnolds nevertheless negligently confined the pony to a field fenced at places only to the height of 36 ½ inches.

The plaintiff observes that while there was no direct evidence the pony had jumped the fence, the jury could conclude that all other possible explanations of the filly's departure from the pasture had been excluded by the plaintiff's evidence. She notes there had been no cutting of the fence because there were no breaks in it, trespassers had never been known to go into or through the field, strangers had not ridden the horses, and the Arnolds had no enemies. She argues that the only reasonable explanation of the manner in which the pony got out of the field was that the fence was inadequate to restrain her.

Accordingly, the plaintiff maintains, it was foreseeable that the pony could escape the field under these circumstances and the trial court should have allowed the jury to consider whether any such negligent maintenance of the fence was a proximate cause of the accident. We do not agree.

■ The plaintiff's argument is based on an unsound premise. The evidence was wholly inadequate and insufficient to prove the 52-inch pony could and would jump a fence ranging in height from 36 to 56 inches. The only evidence on this subject was the statement attributed to Arnold by the officer that "it was *possible*" the pony "*could* have jumped the fence," and that she was a "jumper." Proof of "possibility" that a fact exists is not enough to take the issue out of the sphere of pure conjecture and rank speculation into the realm of legitimate inference, sufficient for a jury to be permitted to consider the question. *See Wilkins* v. *Sibley*, 205 Va. 171, 174, 135 S.E.2d 765, 767 (1964).

In *Wilkins*, a mule owned by the defendants was struck at night on a public highway by a truck operated by the plaintiff, who suffered personal injuries as a result of the collision. After the accident, a nearby pasture "gap" was open, which enabled the animal to escape the fenced field. There was no evidence when or how the gap was opened or when the mule escaped. The evidence was undisputed that none of the animals enclosed in the pasture had previously escaped from the field. The plaintiff theorized that one of the animals opened the gap using its head to disengage wire employed to close the gap. The only evidence supporting this idea came from the testimony of a witness who said that "it was possible" for one of the animals to have done so. Reversing a judgment for the plaintiff, we said that "[p]roof of 'possibility' of causal connection is not sufficient." *Id.* at 175, 135 S.E.2d at 767. We concluded that in view of the lack of evidence that the animals

previously had escaped in this manner, or had attempted so to do, the conclusion of the jury that the mule escaped the pasture because of the insecure manner the gap was fastened was "based not on evidence, but on conjecture and speculation." *Id.* at 175, 135 S.E.2d at 767.

■ Moreover, bare testimony here that the pony was a "jumper" is likewise insufficient to establish the pony had a propensity to jump a fence of the height shown by this evidence. This was a mere expression of opinion by Arnold and not a statement of fact. *See Rice v. Turner*, 191 Va. 601, 608, 62 S.E.2d 24, 27 (1950). The evidence was uncontradicted that Arnold had no direct contact with, and no definitive knowledge of, the tendencies of the filly. Indeed, the evidence showed that the daughter handled and cared for the pony exclusively and furnished whatever training the pony had prior to the accident.

In *Rice*, the plaintiff sustained personal injury and property damage when his automobile collided with defendant's cow on a public highway. One of defendant's employees told a witness for plaintiff that the "cow never was put up, she was left out" after a herd had been transferred from one pasture to another. This Court reversed a judgment in favor of the plaintiff, finding that the only reasonable construction to be placed upon the employee's statements was that he intended to express an opinion "as to how the cow might have strayed from defendant's premises on the highway." *Id.* at 608, 62 S.E.2d at 27. We decided that plaintiff's evidence was "insufficient to prove that the cow was at large with the knowledge and consent of defendant, or that her escape from defendant's premises was due to his negligence." *Id.* at 609, 62 S.E.2d at 27.

Because the record here is devoid of evidence having any probative value to prove the pony had the ability and propensity to jump the fence in question, there was no basis upon which to submit to the jury the question whether it was reasonably foreseeable that the pony would escape the pasture under these circumstances. Contrary to the plaintiff's contention, there was no reason for the defendants to have anticipated that confining this pony in this fenced enclosure was liable to result in injury to others. *See Barnette v. Dickens*, 205 Va. 12, 16, 135 S.E.2d 109, 112 (1964).

■ Under present-day conditions, the owner of domestic animals must exercise reasonable care to keep them off public highways. *Rice v. Turner*, 191 Va. at 605, 62 S.E.2d at 26. But negli-

gence cannot be presumed from the mere happening of an accident. The burden is upon the plaintiff to produce evidence of preponderating weight from which the trier of fact can find that the defendants were guilty of negligence which was a proximate cause of the event resulting in injury. The evidence must prove more than a probability of negligence. A plaintiff must show why and how the accident happened. And if the cause is left to conjecture, guess, or random judgment, the plaintiff cannot recover. *Town of West Point* v. *Evans*, 224 Va. 625, 628, 299 S.E.2d 349, 351 (1983).

As we have already said, there was no evidence of negligent restraint. Moreover, the record fails to show how, when, or why the filly left the pasture. The pony had a gentle disposition, stayed close to its mother, had just been fed, and was last seen at a place where additional food was available. There was no apparent reason for the animal to leave the place of confinement. True, the pony may have jumped the fence, but it is just as likely that some unknown person opened and then closed the barn gate or that the pony became excited by another animal and somehow managed to escape the enclosure. In order for a plaintiff to establish a prima facie case of negligence, the evidence must show more than that the accident resulted from one of two causes, for one of which the defendants are responsible and for the other of which they are not. *Cooper* v. *Whiting Oil Co.*, 226 Va. 491, 496, 311 S.E.2d 757, 761 (1984).

Consequently, we hold that the trial court did not err in sustaining the Arnolds' motion to strike the plaintiff's evidence. The judgment below will be

*Affirmed.*