NOLAND COMPANY

V.

NELSON-ROANOKE CORPORATION

Record No. 840938

October 9, 1987

Present: All the Justices

*Richard C. Rakes (Neal S. Johnson; Gentry, Locke, Rakes & Moore*, on briefs), for appellant.

` *Wilbur L. Hazlegrove (Daniel S. Brown; Hazlegrove, Dickinson, Rea, Smeltzer & Brown*, on brief), for appellee.

WHITING, J., delivered the opinion of the Court.

This is a controversy between the owner of a well drilling rig (Noland) and a well driller (Nelson-Roanoke) regarding which

bore the risk of the rig's loss when fire destroyed it on Nelson-Roanoke's job. We must decide whether Noland produced sufficient evidence to create an issue of fact upon the question of whether Nelson-Roanoke had assumed that risk of loss.

The trial court sustained Nelson-Roanoke's motion to strike Noland's evidence. Accordingly, we consider the evidence in the light most favorable to Noland. *See Page* v. *Arnold*, 227 Va. 74, 76, 314 S.E.2d 57, 58 (1984). Considered in that light, we conclude that the trial court erred in striking Noland's evidence.

On two occasions prior to the fire, Noland leased other equipment to Nelson-Roanoke. On both occasions, Nelson-Roanoke assumed the risk of loss under written leases. However, prior to the performance of this contract, Noland's employees had never operated Noland equipment on Nelson-Roanoke's jobs.

About a month prior to delivery of the well drilling rig, Marcus Bramblett, sales manager for Noland, and Dewey Holdaway, then in charge of Nelson-Roanoke's well drilling operations, discussed the lease of the rig. Holdaway indicated that Nelson-Roanoke might not have an operator for the rig and, therefore, might need assistance in doing the job. The parties agreed that Noland would supply a shop mechanic or its shop foreman to instruct Nelson-Roanoke in the operation of the rig. Later, Bramblett told Bobby Mahoney, Noland's shop foreman, that Nelson-Roanoke was to get the rig and that Mahoney might be operating it or assisting in its operation. While Mahoney's hourly rate was not fixed, Bramblett discussed with Holdaway the fact that Nelson-Roanoke would pay Noland for Mahoney's services while on its well-drilling job.

Holdaway told Semones, another employee of Nelson-Roanoke, that Nelson-Roanoke was going to lease the rig from Noland to do the job. Later, Semones took Mahoney to the job site when the rig was delivered on September 27, 1979. During most of the time the rig was in operation, Semones was on the job site driving Nelson-Roanoke's truck and furnishing water. On October 1, 1979, Bramblett signed a written lease containing essentially the same language as the two previous leases, including a provision placing risk of loss on Nelson-Roanoke. A few days before the fire, Bramblett sent the lease by David Holdren, one of Noland's salesmen, to Holdaway for signature and return. Holdren testified that he took the lease to Holdaway about a week before the fire, but he did not recall returning a signed copy to Noland.

On October 10, 1979, fire destroyed the rig while Noland's employees operated it on Nelson-Roanoke's job. Immediately after the fire, Bramblett looked for a signed copy of the lease in Noland's files but could not find it. However, he did eventually find it in the files. Mason Miller, Jr., Noland's credit manager, said Holdren had brought the signed lease to him about 24 hours after the fire.

The motion for judgment alleged the written lease agreement. Nelson-Roanoke's initial answer admitted that the parties had entered into that agreement. However, Nelson-Roanoke denied that the written lease was effective for two reasons. First, Nelson-Roanoke claimed that the parties made a subsequent oral agreement by which Noland became a subcontractor to Nelson-Roanoke to drill the well. Second, it argued that there was no delivery to Nelson-Roanoke, because the rig remained in the control of Noland employees.

More than two years later, Nelson-Roanoke filed an amended grounds of defense neither admitting nor denying execution of the lease by Holdaway. However, Bramblett and Miller testified without contradiction that Holdaway had signed the lease. The trial court admitted the lease in evidence "as proof of the fact . . . that this was the document which affected the relationship of the parties at the time of the loss."*

The trial court sustained the motion to strike Noland's evidence on the ground that Noland had not established the risk of loss would shift to Nelson-Roanoke when Noland's employees operated the rig. The trial court held, as a matter of law, that the written agreement could not be considered as the agreement between the parties because (1) "it was clear it was not the intention of the parties to memorialize this agreement as the intention of the parties under the original agreement," (2) Noland "cannot say with any reasonable degree of accuracy that the lease agreement was delivered prior to the commencement of the lease," and (3) the uncontradicted evidence established "that it was not signed prior to commencement of performance."

■ Viewed in the light most favorable to Noland, a fact finder reasonably could infer that Holdaway had agreed to the terms of this lease because Holdaway's signature on the lease was sufficient

---

* Accordingly, we reject Nelson-Roanoke's contention that the lease was not admitted into evidence.

evidence to create a factual issue as to his agreement to its terms. It makes no difference whether Holdaway signed the lease before or after the fire. *See Girard Ins. and Trust Co.* v. *Cooper,* 162 U.S. 529, 543 (1896); *North America Managers* v. *Reinach,* 177 Va. 116, 121, 12 S.E.2d 806, 808 (1941); *Agostini* v. *Consolvo,* 154 Va. 203, 212-13, 153 S.E. 676, 679 (1930).

We conclude that the trial court erred in striking Noland's evidence. Accordingly, we will reverse the final order and remand the case for further proceedings.

*Reversed and remanded.*