**Lloyd C. EDWARDS, Plaintiff,**

v.

**UNITED STATES of America and John Doe, Defendants.**

**Civ. A. No. 87–0108–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 3, 1987.

Michael Durkin, Alexandria, Va., for plaintiff.

Ralph Boccarosse, Jr., Fairfax, Va., for defendant USA.

Lowry Miller, Arlington, Va., for defendant John Doe.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

ELLIS, District Judge.

### I. *Introduction*

This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, in which plaintiff seeks damages for injuries allegedly sustained when the truck he was driving was struck from behind by an automobile operated by Thomas Moyer, an employee of the United States Park Service. Plaintiff sues the United States, as well as John Doe, an unidentified driver whose negligent lane changing allegedly was a joint cause of the accident.

### II. *Jurisdiction*

The Court has jurisdiction over plaintiff's claim against the United States under 28 U.S.C. § 1346(b). The claim against the John Doe defendant falls within the Court's pendent jurisdiction.[1]

### III. *Findings of Fact*

1. On February 24, 1986, at approximately 6:30 a.m., the plaintiff was driving a 1984 Isuzu pick-up truck in the left lane of the two lane entrance ramp from Old Keene Mill Road to Interstate 95 (I–95). This lane of the two lane ramp allows traffic to feed onto I–95 north to Washington. The right lane feeds traffic to I–95 southbound. Immediately prior to the accident, the car in front of plaintiff on the ramp was being driven by James Stockton, and

---

1. Neither statutory nor constitutional considerations prevent the Court from exercising jurisdiction over the pendent party claim. In *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), the Supreme Court stated that before pendent party jurisdiction may be exercised, a court must determine "that Congress in the statute [ ] conferring jurisdiction has not expressly or by implication negated its existence." *Id.* at 18, 96 S.Ct. at 2422. There is no express or implied negation of pendent party jurisdiction under 28 U.S.C. § 1346(b). *Lykins v. Pointer, Inc.*, 725 F.2d 645, 647–49 (11th Cir. 1984). Further, because Congress vested exclusive jurisdiction over federal tort claims in the federal district courts, only in federal court could plaintiff's claims against both defendants be heard. *Id.* at 648 n. 4. *See also Aldinger*, 427 U.S. at 18, 96 S.Ct. at 2422.

 . The Court also finds that Article III of the Constitution permits the exercise of pendent jurisdiction in this case. The claims against the defendants "derive from a common nucleus of operative fact" and are of such a nature that plaintiff would be expected to try them in one proceeding. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). *See also Lykins*, 725 F.2d at 649. Thus, the Court has the power to hear the claim against John Doe.

Exercise of the court's discretion to hear the pendent party claim is also appropriate in this case. Hearing the claims against both defendants in the same proceeding will promote judicial economy, convenience, and fairness to the plaintiff. *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139.

the car behind the plaintiff was being driven by Thomas Moyer. At the time of the accident, Moyer was a United States Park Service employee and was acting within the scope of his employment.

2. Approximately one car length separated the plaintiff's truck from Stockton's car immediately preceding the accident.

3. There was testimony that while Stockton, the plaintiff and Moyer were proceeding along the left lane of the entrance ramp, two or three cars in the right lane several car lengths ahead of Stockton switched into the left lane. The plaintiff, Stockton and Moyer were aware that drivers frequently changed into the left lane on the entrance ramp in order to feed onto I–95 northbound to Washington, D.C..

4. The traffic immediately ahead of Stockton stopped suddenly, either because vehicles ahead changed lanes or for some other unknown reason. In any event, Stockton braked immediately and was able to stop his vehicle approximately one foot from the vehicle in front of him.

5. Plaintiff also immediately applied his brakes, but failed to stop his vehicle before it collided with Stockton's vehicle. Plaintiff testified that this impact was slight.

6. Within one to three seconds after the plaintiff's truck hit Stockton's car, Moyer's car struck the plaintiff's truck. Moyer was going approximately five to ten miles per hour at the time of the collision. Plaintiff claimed this second impact was more severe than that caused by his collision with Stockton's vehicle.

7. The first collision resulted in relatively little damage to the vehicles involved. The second collision produced significant damage to the rear-end the plaintiff's truck and the front-end of Moyer's car. The tailgate of plaintiff's truck was down at the time of the accident and doubtless contributed substantially to the greater degree of collision damage.

8. The investigating officer, who arrived at the scene shortly after the accident, noted no signs of physical injury to the plaintiff or to any of the other persons involved. The plaintiff refused medical attention at the scene. At trial, however, plaintiff testified that his neck began to hurt immediately after the second collision.

9. Plaintiff, 21 years old at the time of the accident, was employed as a drywall mechanic earning $13.00 per hour. The average income of drywall mechanics in the relevant geographic area is $30,000 per year.

10. The damage to plaintiff's truck was not extensive. Plaintiff was able to drive his truck away from the scene and continue on his way to work. En route, plaintiff decided to stop at Fairfax Hospital to have his neck examined.

11. After examination, the plaintiff was released from the emergency room with a soft-collar and two prescriptions. X-rays of plaintiff's spine showed no abnormalities or evidence of bone damage.

12. On February 27, 1986, Dr. Elmer C. Bigley, Jr., an orthopedic surgeon, examined plaintiff. Dr. Bigley found no signs of bone abnormalities or muscle spasm in the neck area, nor of any abnormalities of the musculo-skeletal or neurocirculatory systems of the upper extremities. Plaintiff was diagnosed as having an acute cervical strain and advised to stay home from work.

13. Plaintiff remained away from his job on Dr. Bigley's advice until March 24, 1987, at which time he began working as a retail clerk at $3.50 per hour for Tandy Leather. In July, 1986, plaintiff accepted a managerial position with Tandy at a shop in Harrisburg, Pennsylvania, at a salary of $13,200 per year. Plaintiff earned a bonus of $780 while employed in Pennsylvania.

14. Plaintiff visited Dr. Bigley ten times dating from his initial visit on February 27 until his move to Pennsylvania in July. On the last such visit, Dr. Bigley concluded that plaintiff's range of motion was 95% of normal. No muscle spasm was noted. Plaintiff also received physical therapy on fifteen occasions from March 13, 1986, to April 21, 1986. Additionally, plaintiff received treatment from Dr. Janet Singer.

15. While in Pennsylvania, plaintiff had three appointments with Dr. James R. Hamsher, an orthopedic surgeon, who diag-

nosed plaintiff as having a mild cervical strain. Despite plaintiff's continued complaints of pain, Dr. Hamsher could find no objective indication that anything was wrong with plaintiff.

16. On January 28, 1987, and July 23, 1987, plaintiff received evaluations from Dr. Jeffrey H. Phillips. On August 4, 1987, Dr. Bigley again examined plaintiff.

17. On August 13, 1987, Dr. John A. Bruno, Jr., an orthopedic surgeon retained by defendants, examined plaintiff. Dr. Bruno, testifying by deposition, stated that he had reviewed the medical records concerning plaintiff's injury, had taken a history from plaintiff and had performed a physical examination of plaintiff. Plaintiff stated at that time that although he was not undergoing further medical treatment, he continued to have pain in the left side of his neck. Dr. Bruno found no abnormalities in the functioning of the nerves in plaintiff's upper extremeties, no signs of muscle spasm and no indication of muscular atrophy. Dr. Bruno concluded that plaintiff had sustained a strain to the muscles of his neck. In Dr. Bruno's judgment, however, plaintiff did not have any neurologic damage nor was there any evidence of a permanent disability.

18. The only further treatment which Dr. Bruno could recommend as of August 13 was an injection of anesthetic and cortisone into the affected area. Thereafter, another physician, Dr. Jammes, performed this procedure. Plaintiff reported at the trial that the injection was unsuccessful in relieving his symptoms.

19. Because there were no objective findings of abnormality, Dr. Bruno testified that he would give plaintiff a disability rating of zero. The zero rating is based on guidelines published by the American Medical Association and the American Academy of Orthopedic Surgeons. According to Dr. Bruno, there is nothing else which can be done at this time from an orthopedic standpoint to relieve plaintiff's symptoms.

20. In September, 1987, plaintiff accepted a job at a Tandy Leather Store on Long Island, New York, at a salary of $18,000 per year.

21. The Court finds that plaintiff either followed too closely or failed to keep a proper lookout, or both, and that this negligence was the proximate cause of plaintiff's collision with Stockton. Plaintiff's negligence, however, was not the proximate cause of either Moyer's collision with plaintiff's vehicle or plaintiff's injury.

22. The Court finds that the proximate cause of plaintiff's alleged injury was Moyer's failure to keep a proper lookout or his following plaintiff too closely, or both, which negligence resulted in Moyer's collision with plaintiff.

23. The Court finds that there is no persuasive proof that Moyer's collision with plaintiff, and hence plaintiff's injury, were proximately caused by some unknown driver in some unidentified vehicle who changed lanes some unspecified distance ahead.

24. The Court rejects testimony to the effect that plaintiff's present medical condition prevents him from returning to drywall work. The Court accepts the testimony of Dr. Bruno on this issue. He testified that there are no orthopedic-related impediments to prevent plaintiff from doing such work. Significantly, Dr. Bruno stated that it was his clear understanding after conversing with plaintiff that plaintiff had no intention of returning to drywall work for reasons unrelated to his medical condition. This testimony is impressively corroborated by the fact that plaintiff took a job with Tandy only a month after the accident and, four months later, moved quite a distance to pursue opportunities within the company. Plaintiff presented no evidence indicating that he has made any serious effort to perform drywall work at any time since the accident. On cross-examination, plaintiff admitted that he has returned to his place of employment at the time of the accident only to pick up a paycheck.

25. The Court rejects testimony given by Richard Strauss, a rehabilitation consultant, that plaintiff's income will never exceed $18,000 per year. Indeed, Mr. Strauss testified that plaintiff has no hope of increasing his income even if he obtains his

graduate equivalency degree. Although Strauss opined that plaintiff had reached his maximum earning capacity within Tandy, Mr. Strauss provided the court with no basis for believing that plaintiff could not exceed his present income by changing employers. Further, as elicited on cross-examination, Strauss had concluded in June of 1987 that it would take plaintiff ten years to reach $18,000 per year within Tandy. Plaintiff in fact achieved a salary of $18,000 per year by September, 1987. In sum, the Court finds the claim that plaintiff's income will never exceed $18,000 too speculative to countenance.

26. The Court finds that plaintiff is entitled to damages from the United States in the amount of $32,310.55. This figure consists of $707.23 for damage to plaintiff's vehicle;[2] lost income of $24,247.00;[3] medical expenses of $2356.32;[4] and $5000.00 for pain and suffering.

## IV. *Conclusions of Law*

Plaintiff is entitled to recovery from the United States because Moyer's negligence proximately caused his injuries. Under Virginia Code section 46.1–213(a), a driver must not follow another vehicle more closely than is reasonable under the circumstances. It is also the duty of every driver to keep a proper lookout for the sudden stopping of vehicles ahead. *Maroulis v. Elliott,* 207 Va. 503, 151 S.E.2d 339, 344 (1966). The Virginia Supreme Court has held that a *prima facie* case of negligence is established if the plaintiff shows that he was hit from the rear while stopped in a

line of traffic. *Weems v. Blalock,* 226 Va. 304, 309 S.E.2d 302, 303 (1983). The Court finds that plaintiff here established a *prima facie* case that Moyer negligently failed to keep a proper lookout and was following the plaintiff more closely than was reasonable at the time of the accident.

To rebut plaintiff's case, the United States relies primarily on the fact that plaintiff hit the car in front of him. The United States asks the Court to draw the conclusion from this fact that the plaintiff was contributorily negligent and that he is therefore not entitled to recovery.[5] The Court agrees that plaintiff was negligent in hitting the car in front of him, for the same reasons that Moyer was negligent in colliding with the rear of plaintiff's vehicle. However, in order for the doctrine of contributory negligence to bar recovery, the defendant must show that the plaintiff's negligence was a proximate cause of the accident. *Whitfield v. Dunn,* 202 Va. 472, 117 S.E.2d 710, 713 (1961).[6]

The United States produced no persuasive evidence to indicate that plaintiff's negligence was a cause of the collision between Moyer's and the plaintiff's vehicle. Moreover, Moyer had a duty to avoid hitting the back of plaintiff's vehicle whatever the reason for plaintiff's sudden stop. *Maroulis,* 151 S.E.2d at 344. Finally, there was ample evidence to support a finding that it was the collision between Moyer's and the plaintiff's vehicle, rather than the collision between plaintiff's and Stockton's vehicles, which caused the plaintiff's injury. Thus, Moyer's negligent failure to stop

---

**2.** Repairs to the front-end of plaintiff's truck are excluded from this number.

**3.** This figure was derived by adding the amount plaintiff would have earned as a drywall mechanic from February 24, 1986, to March 24, 1986, and the amount plaintiff would have earned as a drywall mechanic minus the amount he earned at Tandy from March 24, 1986, to August 17, 1987. August 17 was chosen as the cut-off date for purposes of lost income because it was the first Monday after Dr. Bruno determined that plaintiff had no disability.

**4.** The United States stipulated that plaintiff's medical expenses were reasonable and necessary.

**5.** In Virginia, a plaintiff's contributing negligence bars recovery if it is a proximate cause of the plaintiff's injury. *Fein v. Wade,* 191 Va. 203, 61 S.E.2d 29, 32 (1950).

**6.** Cf. *Bowers v. May,* 233 Va. 411, 357 S.E.2d 29 (1987). In *Bowers v. May,* the Virignia Supreme Court upheld a jury verdict in favor of the defendant in a rear-end collision case and noted that the question of whether there is a causal connection between the plaintiff's negligence and the accident is inherently one for the jury. *Id.* 357 S.E.2d at 30. In this case, the court, as the fact-finder, concludes that there was not a causal relationship between the plaintiff's negligence and the second collision.

his vehicle after seeing plaintiff stop was the proximate cause of both plaintiff's injury and the damage to the rear of plaintiff's truck.

The evidence was insufficient as a matter of law to establish negligence on the part of the John Doe defendant. The theory of the plaintiff's claim against John Doe is that he suddenly and negligently changed from the right lane to the left lane, causing the cars behind him to stop abruptly. Under Virginia law, "Plaintiff had the burden to prove that an unknown motorist, John Doe, was present and that his negligence proximately caused the collision." *Doe v. Houser*, 213 Va. 617, 194 S.E.2d 754, 755 (1973). Here, there was testimony that one or more John Does switched lanes in front of the Stockton vehicle. Importantly, however, no evidence was introduced to show that the John Doe defendant negligently changed lanes or that his negligence proximately caused the accident. There was no testimony that John Doe failed to use his left turn signal or that he violated any other traffic rule. The evidence did not even clearly establish where John Doe's automobile was in relation to Stockton's and the plaintiff's automobiles. Indeed, it is not even clear that the sudden stop of traffic was caused by a vehicle changing lanes. In any event, the plaintiff, Stockton and Moyer testified that they knew that drivers commonly change lanes on the entrance ramp.[7] Thus, because any judgment in favor of the plaintiff against John Doe would be based on speculation, the Court refuses to hold John Doe liable. *See Page v. Arnold*, 227 Va. 74, 314 S.E.2d 57, 60 (1984).

An order will issue reflecting the Court's judgment in this case.

---

**7.** Arguably, this knowledge should have warned plaintiff, Stockton and Moyer to exercise special caution in the circumstances. *See Harris v. Howerton*, 169 Va. 647, 194 S.E. 692, 695, 696 (1938) (plaintiff whose vehicle collided into rearend of parked truck and who testified that he was familiar with street on which accident occurred and that he knew it was the residents' habit to park their cars on the street without lights found contributorily negligent as a matter of law).