PRESENT: All the Justices

EMERGENCY PHYSICIANS OF TIDEWATER, PLC
AND ALLISON L. RAINES, D.O.

                                                    OPINION BY
v. Record No. 230199                    JUSTICE THOMAS P. MANN
                                                    APRIL 4, 2024

PATRICIA HANGER


FROM THE COURT OF APPEALS

In this medical malpractice case, Patricia Hanger alleged that Dr. Allison L. Raines and

Emergency Physicians of Tidewater, PLC (together, "Appellants") negligently failed to treat

Hanger's low blood sodium. Hanger maintained that it was this negligence which caused her to

suffer a seizure, resulting in a traumatic brain injury from a fall. The Appellants continuously

asserted throughout trial that the fall could have been caused through other means. A jury

disagreed with Appellants and returned a $1.6 million verdict for Hanger, which the Court of

Appeals affirmed by unpublished opinion.

The sole question before this Court is whether the trial court's refusal of a jury instruction

supporting Appellants' theory of the case was erroneous. The Court of Appeals held that this

question was waived. For the reasons that follow, we conclude that the Appellants did not waive

their right to appeal this question and, further, that they were entitled to the issuance of their

proffered jury instruction.

I. BACKGROUND

A. Hanger's Medical Treatment

Hanger and her husband, Kurt Hanger, went to the emergency room of the Sentara Leigh

Hospital ("ER") on March 16, 2017, for her complaints of abdominal pain and nausea. She was

given medication to relieve her pain and nausea along with two liters of intravenous saline

solution. Dr. Raines ordered numerous tests for Hanger, including a blood test and a CAT scan of her abdomen. Hanger's CAT scan was normal, but her blood sodium was low, testing at 122 millimoles per liter, below the normal range of 133 to 145 millimoles. This condition is known as hyponatremia. Hanger had previously developed hyponatremia following a hysterectomy in January 2017 and had to remain hospitalized until her blood sodium rose to a proper level.

Dr. Raines noted a diagnosis of hyponatremia in Hanger's chart. Dr. Raines asserted that she discussed the issue with Hanger and Hanger's husband and told Hanger to follow up with her family doctor, Dr. George S. Wong, for treatment of her hyponatremia. Hanger asserted that she was never told of the hyponatremia diagnosis. Dr. Raines' written discharge instructions did not reference hyponatremia or blood sodium.

Hanger scheduled a follow-up appointment with Dr. Wong's office. Because Dr. Wong's practice was owned by Sentara Healthcare, Dr. Wong's office had access to all of Hanger's ER records. Hanger's follow-up visit occurred on March 22, 2017, and she was seen by Sam Roberts, a physician's assistant ("P.A.") under Dr. Wong's supervision. P.A. Roberts' notes of Hanger's visit indicate that Hanger complained of depression and anxiety, and incorrectly noted that "all workup" during her ER visit "was negative." Roberts prescribed Hanger the antidepressant Celexa, but the visit notes reflect no discussion or treatment of Hanger's low blood sodium level.

### B. Hanger's Head Injury

On March 28, 2017, Kurt arrived home at approximately 2:45 p.m. and discovered Hanger sitting on the kitchen floor, leaning against the wall, bleeding from a wound over her right eye. Hanger's eyes were open, but she "just wasn't responsive." There was a blood stain on the corner of a nearby water cooler and two blood stains on the floor. Kurt asserted that he

did not see anything that could have caused Hanger to fall and that she had never fainted, passed out, or had a seizure, nor had she ever tripped or fallen in his presence.

Paramedics initially transported Hanger to Sentara Leigh Hospital, but due to the seriousness of her injuries, she was transferred the same day to Sentara Norfolk General Hospital ("Norfolk General"). Hanger's blood sodium measured 115 when she was admitted and fell to 111 the next day. She was treated for hyponatremia and her blood sodium rose to 131 when she was discharged on April 3, 2017. Based on a CT scan, Hanger's treating physician, Dr. Dana Adkins, opined that Hanger suffered a traumatic brain injury ("TBI") when she fell. A speech pathologist found that Hanger had speech deficits, which Adkins attributed to the TBI. However, Adkins acknowledged an entry in Hanger's hospital record which stated that she suffered a "steady decline" in her functioning and activities of daily living following her hysterectomy in January 2017.

Following her discharge from Norfolk General on April 3, 2017, Hanger entered a rehabilitation facility where she remained until April 15, 2017. When she left the facility, Hanger could walk with the assistance of a walker but required around the clock supervision. A follow-up note from the facility dated June 5, 2017, indicated that she still had headaches, but they were improving. The note also indicated that Hanger's son estimated that her cognitive ability was "at 99 percent with occasional lapses and confusion." Hanger continued receiving outpatient therapy until June 2017.

Kurt testified that after Hanger completed rehabilitation, she was "back doing things but not her normal things." She no longer exercised frequently, drove, shopped for groceries, cleaned the house, managed the couple's finances, or attended events at her local recreation center. Due to her cognitive issues, Kurt no longer allowed her to care for the couple's

3

grandchildren. According to Kurt, Hanger's personality was completely changed following her head injury, and she was irritable and forgetful.

## C. Evidence Presented at Trial

Hanger filed a medical malpractice action against the Appellants alleging that their failure to treat her hyponatremia caused her to have a seizure, fall, strike her head, and suffer a TBI. In addition to testimony about her initial ER visit and subsequent head injury, numerous photographs were entered into evidence and experts for both Hanger and the Appellants opined as to the cause of Hanger's head injury.

### 1. *Photographic Evidence*

On the day Hanger suffered her TBI, Kurt took photographs of the blood stains on the floor. Several of these photographs reveal a metal air vent with a plastic deflector on the kitchen floor adjacent to the wall and between the water cooler and blood stains. In the photographs, taken near the time of Hanger's fall, the deflector appears dislodged, with roughly half the deflector covering the vent and the other half extending into the walkway towards the blood stains. Kurt and Hanger later took additional photographs in which Kurt replicated the position he found her in. In these staged photographs, the deflector is properly attached to or covering the vent.

### 2. *Evidence of Causation*

Russell Blow, a paramedic who treated Hanger after her fall, testified that she suffered head injuries and abrasions to her right elbow, vomited, and was somewhat combative and not following commands. His electronic report of the incident listed the cause as "slip, trip, stumble," but Blow testified that he did not actually know the cause of Hanger's fall. Blow explained that his electronic device required him to choose a cause from a drop-down menu, and

4

that he chose this option merely because it "best fit that particular situation." Blow recorded that Hanger "believed she fell at 1300 hours today but [did] not remember anything after the event." He did not report any slippery substances on the floor or any obstructions that might have caused Hanger to fall.

Dr. Adkins testified that hyponatremia might have caused her fall but acknowledged it was "part of a wide range" of potential causes and that he did not reach an opinion to any reasonable degree of certainty. Adkins' testimony recounted that Dr. Harlan Rust, a nephrologist, consulted on Hanger's case and concluded that her low blood sodium was caused by Celexa and hydrochlorothiazide ("HCTZ"), a blood pressure medication. Rust instructed Hanger to cease taking these medications.

Dr. Kenneth D. Larsen, an emergency medicine physician, testified as an expert for Hanger. Dr. Larsen opined that Hanger's hyponatremia when she visited the ER was life-threatening and that Dr. Raines should have admitted her to the hospital for treatment, or at least should have noted a hyponatremia diagnosis in Hanger's record to inform other medical providers about the issue and should have followed up with Dr. Wong's office to ensure that the issue was addressed.[1] He opined that Hanger's low blood sodium caused her to suffer a hyponatremic seizure and lose consciousness, which in turn caused her injuries. On cross-examination, Dr. Larsen acknowledged Celexa and HCTZ could lower blood sodium but stated that this was "very uncommon" with HCTZ and "very, very uncommon" with Celexa. He opined that if Hanger had been admitted, her HCTZ would have been stopped and she never would have been prescribed Celexa. Finally, Larsen acknowledged that he did not know the precise mechanism by which Hanger struck her head since no one witnessed her fall.

---

[1] The diagnosis of hyponatremia was included in Hanger's chart.

5

Dr. Richard Serra provided similar testimony to that of Dr. Larsen, opining that Hanger's injuries were caused by a "hyponatremic event" and that her low sodium was "associated with different possibilities of altered mental status including seizures." He testified that her hyponatremia "clearly got worse" which "led to her eventually having a seizure" and suffering blunt-force trauma to her head. Dr. Robert Hansen, a neurologist, testified that Hanger's low blood sodium caused her to suffer a seizure, which in turn caused her head injury. He opined her behavior when Kurt found her suggested she was in a postictal state, which occurs after a seizure.

Appellants called Dr. Jeffrey Smith and Dr. Gregory Marchand, two ER physicians, as expert witnesses who both opined that Dr. Raines' treatment of Hanger complied with the applicable standard of care. Then, Dr. Marek A. Mirski, a neurologist and critical care physician, opined as an expert witness that Hanger did not suffer a hyponatremic seizure on the day of her fall. Dr. Mirski asserted that Hanger did not lose consciousness, nor did she experience issues with memory or continency. Additionally, Dr. Mirski noted that Hanger did not have any lip or tongue injuries, elevated levels of creatine kinase, or limb soreness. All of these factors would have been indications of a seizure. Dr. Mirski also noted that hyponatremic seizures are uncommon when a patient's blood sodium is above 110 and that Hanger's blood sodium was 114 after her admission to Norfolk General. He also testified that HCTZ and Celexa can lower a patient's blood sodium. On cross-examination, Dr. Mirski testified that Hanger's altered mental status when Kurt found her on the kitchen floor could be a symptom of severe hyponatremia but could also be a result of the TBI she suffered when she fell. Dr. Mirski identified various possibilities that could have caused Hanger's fall other than hyponatremia,

6

including a trip and fall, stress-induced fainting, low blood pressure, cardiac arrythmia, a mild stroke, a heart attack, or a pulmonary embolus.

Dr. Michael G. Seneff, a critical and intensive care physician, also opined that Hanger did not suffer from a hyponatremia induced seizure. Dr. Seneff, like Dr. Mirski, believed that Hanger did not suffer a seizure at Norfolk General, even though her blood sodium fell as low as 112 while she was there. Dr. Seneff testified that Hanger's use of HCTZ and Celexa may have been the cause of her low sodium. On cross-examination, Dr. Seneff reasserted his belief that Hanger's injuries were caused by a "mechanical fall." Hanger showed Dr. Seneff the photograph of the blood stains on the kitchen floor in the Hangers' home, and the partially dislodged air deflector, and asked him if it was possible the paramedics dislodged the deflector while treating Hanger. Seneff responded, "I'm not a crime scene analyst or accident analyst, but if I look at that, it looks to me like it's been tripped over."

Hanger recalled Dr. Hansen as a rebuttal witness. He testified that creatine kinase is not a significant factor in determining whether a patient has suffered a seizure, that "no laboratory test can exclude or verify that there was a seizure," and that not all seizure patients experience muscle soreness or incontinence.

### D. Instructions to the Jury

The court issued 25 jury instructions, two of which addressed the issue of causation. Instruction No. 20 was a proximate cause instruction which stated:

> A proximate cause of an injury[] or damage is a cause that, in natural and continuous sequence, produces the accident, injury, or damage. It is a cause without which the injury[] or damage would not have occurred.

Instruction No. 21 was a multiple causation instruction, which stated:

7

> There may be more than one proximate cause of an injury. If the negligence of a defendant proximately caused injury to Patricia Hanger, then the negligence of that defendant is a proximate cause of Patricia Hanger's injury even if there were other acts or omissions that caused her injuries.

At one point in the discussion on jury instructions, the trial court stated, "there are alleged multiple or at least more than one proximate cause of Ms. Hanger's injuries." Appellants proffered an instruction that read:

> If you believe from the evidence that the injury to Patricia Hanger might have resulted from either of two causes, for one of which Dr. Raines might have been responsible and for the other of which Dr. Raines was not responsible, and if you are unable to determine which of the two causes occasioned the injury complained of, then the plaintiff cannot recover.

The Appellants noted there were "plenty" of potential causes that had "nothing to do" with Dr. Raines' actions, such as Celexa. Hanger's counsel objected to the proffered instruction, arguing "[w]e don't believe it is the law." The court responded that the instruction "may be the law, but it's not the law applicable in this context." The court then refused the instruction, marking it "Defendants' D refused" ("Instruction D").

The jury returned a verdict for Hanger, awarding damages of $1.6 million, and the court entered judgment for Hanger in that amount.

### E. The Court of Appeals Ruling

The Court of Appeals affirmed the judgment in an unpublished opinion. *Emergency Physicians of Tidewater, PLC v. Hanger*, No. 0121-22-1, 2023 Va. App. LEXIS 87 (Va. Ct. App. Feb. 7, 2023). The Court of Appeals affirmatively held that Instruction D "articulates the law correctly," and confirmed that the only question before the trial court was whether there was

8

sufficient evidence that another cause led to Hanger's accident. *Id.* at 21.[2]  However, the Court

of Appeals never reached the merits of the assignment of error. *Id.*  Instead, the Court of

Appeals held that the Appellants waived their argument that the injury was caused by a

mechanical trip-and-fall by raising it for the first time on appeal. *Id.*  Furthermore, Appellants'

argument made in support of Instruction D was deemed waived or abandoned by the Court of

Appeals under Rule 5A:20. *Id.*

We do not agree.

## II. ANALYSIS

### A. Preservation of Argument

As a preliminary matter, we must address whether the assignment of error before this

Court was preserved and appropriately maintained throughout the appellate process.  The Court

of Appeals' interpretation of the Rules of this Court presents a question of law that we review de

novo. *LeCava v. Commonwealth*, 283 Va. 465, 469-70 (2012).

The Court of Appeals held that the Appellants waived their challenge to the denial of

Instruction D on trip-and-fall grounds because they "ma[d]e this argument for the first time on

appeal."  The Court of Appeals ruling is premised on the idea that the proponent of a jury

instruction must argue the specific grounds and relevant facts for the instruction at the time it is

proffered in order to preserve the challenge for an appeal.  That is not so.

"When a trial court refuses to give an instruction proffered by a party that is a correct

statement of law and which is supported by adequate evidence in the record, this action, *without

more*, is sufficient to preserve for appeal the issue of whether the trial court erred in refusing the

---

[2] We note that the Court of Appeals identifies this as a superseding cause.  However, the issue before the trial court was whether Dr. Raines' negligence was the cause-in-fact of Hanger's injury, not whether there was an unspecified superseding cause of Hanger's injuries.

9

instruction." *Commonwealth v. Cary*, 271 Va. 87, 98 (2006) (citations omitted) (emphasis added). Under *Cary*, the proponent need not "expressly articulate" the evidentiary basis for the instruction because the trial court has already heard the evidence and can evaluate its application to the instruction. *Id.*

While *Cary* is the law applicable to criminal cases, its logic applies in this context as well. This Court has emphasized in prior holdings concerning preservation of arguments that, so long as "a trial court is aware of a litigant's legal position and the litigant did not expressly waive such arguments, the arguments remain preserved for appeal." *Brown v. Commonwealth*, 279 Va. 210, 217 (2010) (citing *Helms v. Manspile*, 277 Va. 1, 7 (2009)). During the jury instruction phase of trial, counsel is not required to supply the trial court with specific facts in support of proffered instructions when the trial court is already aware of a party's legal position and the applicable facts in evidence.

Here, Appellants' objection to the trial court's refusal to issue Instruction D was preserved. Hanger and Appellants had each admitted evidence as to their theories of the case and the record demonstrates that the trial court was aware of the legal arguments made and the relevant evidence admitted in support of the instructions. This alone was sufficient to preserve the issue for appeal. Appellants also adequately briefed the matter before the Court of Appeals and this Court, thus preserving their objection made at the trial court throughout the appellate process. Accordingly, the Court of Appeals erred in not addressing whether the trial court erred in refusing to issue Instruction D.

### B. Instruction D

One of a trial court's most important responsibilities is to ensure that a jury is properly instructed. "A litigant is entitled to jury instructions supporting his or her theory of the case if

sufficient evidence is introduced to support that theory and if the instructions correctly state the law." *Schlimmer v. Poverty Hunt Club*, 268 Va. 74, 78 (2004) (citations omitted). The evidence supporting the instruction "must amount to more than a scintilla." *Id.* However, if the instruction "finds any support in credible evidence, its refusal is reversible error." *Id.* "It is immaterial that the jury could have reached contrary conclusions." *Id.*

Instruction D finds its roots in *Page v. Arnold*, 227 Va. 74 (1984).[3] "In order for a plaintiff to establish a prima facie case of negligence, the evidence must show more than that the accident resulted from one of two causes, for one of which the defendants are responsible and for the other of which they are not." *Id.* at 81 (*citing Cooper v. Whiting Oil Co.*, 226 Va. 491, 496 (1984)). It is axiomatic that, if a jury cannot determine whether the cause of the injury was attributable to the defendant's negligence or another cause, the plaintiff cannot recover from the defendant. *Norfolk & W.R. Co. v. Poole's Adm'r*, 100 Va. 148, 153-54 (1902).[4] When suggesting an alternative cause, the defendant need not prove negligence by a third party as injuries may arise without negligent conduct. *Cooper*, 226 Va. at 496.

Appellants' evidence challenging Plaintiff's theory of causation was properly before the jury. Not only was Instruction D a correct statement of law, as noted by the trial court in refusing the proffered instruction, but it was applicable to the facts presented during trial. There

---

[3] Appellants assert that this Court permitted a similar instruction in *Mastin v. Theirjung*, 238 Va. 434, 439 (1989). However, we did not expressly approve the language in *Mastin* as the matter was barred by Rule 5:25.

[4] This is distinguished from a situation where "separate and independent acts of negligence of two parties are the direct cause of a single injury to a third person and it is impossible to determine in what proportion each contributed to an injury," and either or both parties are responsible for the "whole injury." *Maroulis v. Elliott*, 207 Va. 503, 511 (1966).

was more than a scintilla of evidence presented that another cause could have led to Hanger's injury, including Celexa, HCTZ, or a mechanical trip and fall.

Furthermore, the issuance of Instructions 20 and 21 does not remedy the error of refusing Instruction D. Instruction 20 provided the definition of proximate cause and Instruction 21 provided guidance for where there is more than one proximate cause of an injury. Instruction D provided the jury with a compulsory direction as to the appropriate verdict where the cause cannot be determined. Instruction D was not merely cumulative of the law provided in Instructions 20 and 21; rather, it provided an affirmative statement of the law relating to causation.

III. CONCLUSION

Instruction D correctly stated the law and was supported by more than a scintilla of the evidence. Thus, the trial court's failure to issue the jury instruction was reversable error and the Court of Appeals' declination to rule on the matter was also error.

The Court of Appeals will ultimately remand this matter to the trial court, but it is uncertain how the proceedings will unfold. The approach and strategy to the litigation may change, and unexpected factors inherent to any case might emerge. Consequently, the evidence that is eventually presented to the jury will determine whether Instruction D, if proposed, should be given upon any retrial in line with this opinion. Accordingly, this matter is reversed and remanded to the Court of Appeals to enter a mandate to the trial court consistent with the opinion herein.

*Reversed and remanded.*