**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 16-6871**

_____

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

v.

RAY WALLACE METTETAL, JR., a/k/a Steven Ray Maupin,

          Defendant - Appellant,

------------------------------

CAROL ANNE SZURKOWSKI,

          Court-Assigned Amicus Counsel.

_____

Appeal from the United States District Court for the Western District of Virginia, at Charlottesville. Norman K. Moon, Senior District Judge. (3:96-cr-50034-NKM-1)

_____

Argued: October 26, 2017                  Decided: December 4, 2017

_____

Before WILKINSON, MOTZ, and HARRIS, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Wilkinson wrote the opinion, in which Judge Motz and Judge Harris joined.

_____

**ARGUED:** Carol Anne Szurkowski, COVINGTON & BURLING, LLP, Washington, D.C., Court-Assigned Amicus Counsel. Rachel Barish Swartz, OFFICE OF THE

UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Rick A. Mountcastle, Acting United States Attorney, Ronald M. Huber, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

Ray Wallace Mettetal, Jr., seeks to expunge records of convictions vacated long ago by this court because his arrest lacked probable cause. The district court declined to expunge those records. For the following reasons, we affirm.

I

On August 22, 1995, Mettetal was arrested on the campus of Vanderbilt University. The arrest occurred after a Vanderbilt employee called the campus police to report that a man wearing a fake beard, a wig, and a dark suit was loitering in a campus parking lot on a 90-degree morning.

Several officers responded. One of those officers later stated that Mettetal was wearing "an obvious fake Afro wig and a fake beard that looked like Abraham Lincoln." JA 53. The officers asked Mettetal what he was doing in the parking lot. Mettetal responded that he was looking for his girlfriend because he thought that she was seeing someone else. Suspecting Mettetal of stalking, one of the officers asked him the woman's name. Mettetal refused to provide it.

When an officer asked Mettetal for identification, Mettetal initially said that he did not have any identification with him. Another officer then threatened to arrest him for trespassing, and Mettetal produced identification purportedly from the British West Indies in the name of Steven Ray Maupin. The officers suspected that the identification was forged because its covering had rough edges, indicating that it had been laminated recently. The officers then asked their dispatcher to run a computer check on the name

3

Steven Ray Maupin. After the check produced no information, the officers arrested Mettetal for criminal trespass.

Following his arrest, the officers searched Mettetal's bag and person. In his bag, the police found, among other things, fake tattoos and a large hypodermic syringe filled with a clear liquid. The syringe was later found to contain a saline solution. Once Mettetal was taken into custody, he refused to answer questions or disclose his true identity. The next day, the Nashville police learned from the FBI that the man was Ray Wallace Mettetal, Jr., a physician from Harrisonburg, Virginia.

On August 25, 1995, three days after Mettetal's arrest, Virginia police obtained warrants to search his home and office. The information used to support these warrants came directly from the circumstances that led to Mettetal's arrest and the information discovered during the search incident to his arrest. While searching Mettetal's home, the police found false identification documents in the name of Steven Ray Maupin, fake hair and moustaches, makeup, a hospital uniform from the Vanderbilt medical center, and a book on disguise techniques that contained notes describing the home, cars, and personal history of one of his colleagues at the Vanderbilt hospital.

Shortly after the police searched Mettetal's home, a local Virginia newspaper printed a story about Mettetal's arrest. The story mentioned that Mettetal had used the name "Maupin" as an alias. An employee at a Harrisonburg storage facility saw the story and informed the police that someone had rented a storage unit in December 1994 under the name Steven Ray Maupin. Based on the information discovered as a result of

4

Mettetal's arrest, the police obtained a warrant to search the storage unit. During the search, the police found a jar of the deadly toxin ricin.

Mettetal was then indicted on two counts in the Western District of Virginia. Count I charged him with possession of a toxin (ricin) for use as a weapon, in violation of 18 U.S.C. § 175; Count II charged him with possession with intent to use five or more false identification documents, in violation of 18 U.S.C. § 1028(a)(3).

At trial, Mettetal moved to suppress the evidence seized from his apartment and storage facility. He argued that the Fourth Amendment exclusionary rule prohibited the district court from admitting any evidence that could be tied to his arrest, including the false identification documents found in his home and the ricin found in the storage unit, because that evidence was obtained illegally. After holding a suppression hearing, the district court found that the police officers had probable cause to arrest Mettetal. In so finding, the district court emphasized the following facts: that Mettetal gave the Vanderbilt campus police an identification they suspected was false; that he was wearing an elaborate disguise; that he refused to cooperate with the police; and that he claimed to be looking for an unidentified female friend. Because the court concluded that the arrest was lawful, it denied Mettetal's motion to suppress. A jury then convicted Mettetal on both of the counts brought against him.

Mettetal appealed his conviction on the ground that the district court erred in denying his suppression motion. On appeal, this court overturned Mettetal's conviction. It found that neither Mettetal's disguise nor his refusal to cooperate with the police provided a reasonable basis to arrest him for trespass. And, because the evidence used to

5

convict him "was the fruit of that unlawful arrest," the court concluded that it should have been suppressed. *United States v. Mettetal*, 213 F.3d 634, 634 (4th Cir. May 3, 2000) (Table).

On remand, the district court again admitted the evidence against Mettetal, reasoning that it was admissible because it was obtained as a result of a judicially-issued warrant. A jury again convicted Mettetal in 2001, and we overturned his conviction a second time, finding that all evidence discovered as a result of Mettetal's unlawful arrest was inadmissible. *See United States v. Mettetal*, 48 Fed. Appx. 895, 897 (4th Cir. 2002) (per curiam). Following that decision, the district court dismissed the indictment against Mettetal on December 10, 2002.

Twenty years after his arrest and fourteen years after the charges against him were dismissed, Mettetal petitioned to have his criminal record expunged on two grounds. First, he claimed to have faced a variety of difficulties in the years after judicial proceedings concluded, and he contended that those difficulties were attributable to records of his arrest and overturned convictions. Second, he claimed that because this court had held that his arrest and convictions violated the constitution, they should be expunged.

The district court considered—and ultimately rejected—Mettetal's petition to have his record expunged. After observing that courts "have the statutory power to expunge documents relating to a criminal charge in only narrow situations not applicable here," JA 97, the district court went on to consider whether it had ancillary jurisdiction under

*Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375, 377 (1994).[1]

The Supreme Court there explained that federal courts have ancillary jurisdiction in only two circumstances: (1) where necessary "to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent"; and (2) "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority and effectuate its decrees." 511 U.S. at 379-80. The district court found that neither prong of *Kokkonen* was satisfied in this case.

Mettetal now appeals. We first consider whether we may expunge Mettetal's criminal record for equitable reasons. Following our seven sister circuits that have already considered the question, we hold that *Kokkonen* bars us from expunging this record on equitable grounds. We shall then consider whether the fact of Mettetal's unlawful arrest—that the officers lacked probable cause to arrest Mettetal and search his belongings—provides a separate basis for expunction relief. Because we find that Mettetal's second claimed grounds for expunction fails on the merits, we decline to resolve the jurisdictional question.

II.

---

[1] The Sixth Circuit usefully distinguished between supplemental jurisdiction and ancillary jurisdiction in *United States v. Field*, 756 F.3d 911, 913 (6th Cir. 2014) ("'Supplemental' or 'pendent' jurisdiction applies to *claims* asserted in a pending federal-court case. 'Ancillary' jurisdiction applies to related *proceedings* that are technically separate from the initial case that invoked federal subject-matter jurisdiction."); *See also* 13 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3523, at 154 (3d ed. 2008). Supplemental jurisdiction is treated under 28 U.S.C. § 1367. Ancillary jurisdiction, by contrast, is governed by case law. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

7

The first portion of Mettetal's pro se petition in the trial court sounded in equity, and we thus turn first to the question of whether we may expunge Mettetal's record on equitable grounds. In support of his request for expungement, Mettetal cited the hardships he claimed to have faced as a result of his criminal record. He contended that "he continues to be harassed by the local medical community and has been unable to obtain hospital privileges due to the existence of adverse information on his record." JA 97. He also complained that because of his record, he had been denied the right to acquire a handgun license in Tennessee, and he asserted that he has had no further arrests or other altercations with law enforcement since he was arrested in 1995. He argued that the harms he has faced "outweigh the government interest" in keeping his criminal records. JA 74. He therefore urged the district court to exercise its "inherent equitable power" to "expunge criminal convictions." *Id*.

It is elementary that federal courts are courts of limited jurisdiction. They "possess only that power authorized by the Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted). Neither the Constitution nor any federal statute confers upon federal courts the power to expunge a criminal conviction such as Mettetal's.

The doctrine of ancillary jurisdiction, however, recognizes that in some circumstances, federal courts have inherent authority to resolve disputes even absent an express statutory grant of jurisdiction. The doctrine originated in "the notion that [when] federal jurisdiction in a principal suit effectively controls the property or fund under dispute, other claimants thereto should be allowed to intervene in order to protect their

8

interests." *Aldinger v. Howard*, 427 U.S. 1, 11 (1976). In other words, ancillary jurisdiction is rooted in the view that claimants with access to federal court should not be permitted to utilize their jurisdictional grant to the detriment of parties whose claims may not be independently justiciable in federal court but are still plainly intertwined with the federal case.

Before the Supreme Court decided *Kokkonen* in 1994, a few circuits had decided that federal courts could invoke ancillary jurisdiction to expunge criminal records for purely equitable reasons, but that they can do so only in the most exceptional circumstances. *See, e.g., United States v. Schnitzer,* 567 F.2d 536, 539 (2d Cir. 1977) ("[E]xpungement lies within the equitable discretion of the court, and relief usually is granted only in 'extreme circumstances.'").[2]

Those decisions, however, predate *Kokkonen*, which the Supreme Court decided in part to ensure that ancillary jurisdiction should only be used to assist federal courts in the exercise of their authorized judicial power. 511 U.S. at 379–80. As noted above, *Kokkonen* explained that ancillary jurisdiction exists for "two separate, though sometimes related, purposes: (1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Id.* (citations omitted). *Kokkonen* thus did not strip courts of all ancillary

---

[2] The Second Circuit has since found that *Kokkonen* prohibits federal courts from invoking ancillary jurisdiction to expunge criminal convictions for purely equitable reasons. *See Doe v. United States*, 833 F.3d 192, 199 (2d Cir. 2016).

jurisdiction. What it did say is that ancillary jurisdiction, while it does exist, must be sparingly exercised. In short, while federal courts have the "virtually unflagging obligation" to exercise the jurisdiction granted them, *Colorado River Water Conservation v. United States*, 424 U.S. 800, 817 (1976), they should not rush to annex jurisdiction on purely ancillary grounds.

Since the Supreme Court decided *Kokkonen* in 1994, seven of our sister circuits have found that *Kokkonen* bars federal courts from invoking ancillary jurisdiction to expunge criminal records for purely equitable reasons.[3] *See United States v. Coloian*, 480 F.3d 47, 52 (1st Cir. 2007) ("*Kokkonen* forecloses any ancillary jurisdiction to order expungement based on . . . equitable reasons."); *Doe v. United States,* 833 F.3d 192, 198 (2d Cir. 2016), cert. denied, 137 S. Ct. 2160 (2017) ("[E]xpunging a record of conviction on equitable grounds is entirely unnecessary to manage a court's proceedings, vindicate its authority, or effectuate its decrees"); *United States v. Dunegan*, 251 F.3d 477, 479 (3d Cir. 2001) (finding that, when a petition rests on equitable grounds, "a District Court does not have the jurisdiction to expunge a criminal record, even when ending in acquittal"); *United States v. Field*, 756 F.3d 911 (6th Cir. 2014) ("[F]ederal courts lack ancillary jurisdiction over motions for expungement based on purely equitable considerations.");

---

[3] It is worth noting that, shortly after the Supreme Court decided *Kokkonen*, the Seventh Circuit held, without discussing *Kokkonen*, that district courts have inherent authority to expunge judicial records for equitable reasons. *See United States v. Flowers*, 389 F.3d 737, 739 (7th Cir. 2004). However, the Seventh Circuit expressly overruled *Flowers* in 2017 and found that *Kokkonen* bars district courts from expunging judicial records on equitable grounds. *See Wahi*, 850 F.3d at 298 ("Because *Flowers* and *Janik* cannot be reconciled with *Kokkonen*, they are overruled.").

*United States v. Wahi*, 850 F.3d 296, 302-03 (7th Cir. 2017) ("[A]ncillary jurisdiction does *not* include a general equitable power to expunge judicial records in a criminal case."); *United States v. Meyer,* 439 F.3d 855, 862 (8th Cir. 2006) ("[I]n light of *Kokkonen*, we conclude that ancillary jurisdiction does not extend to expungement of a criminal conviction where the petitioner asserts solely equitable grounds."); and *United States v. Sumner,* 226 F.3d at 1014 (9th Cir. 2000) ("Expungement of a criminal record solely on equitable grounds . . . does not serve [the ancillary jurisdiction purposes articulated in *Kokkonen* ]."). No circuit has found that *Kokkonen* permits federal courts to expunge judicial records for purely equitable reasons.

We agree with those holdings. *Kokkonen* delineates two circumstances in which federal courts can invoke ancillary jurisdiction. Neither applies to petitions for equitable expungement. The first *Kokkonen* prong—factual interdependence—is clearly not present here. *Kokkonen* considered whether a suit for breach of settlement was factually interdependent with the suit that originally gave rise to the settlement. The Supreme Court noted that the original dispute and the question of whether the settlement agreement had been breached had "nothing to do with each other; it would neither be necessary nor even particularly efficient that they be adjudicated together." *Kokkonen*, 511 U.S. at 380. The Court went on to observe that the facts relevant to determining whether the settlement agreement had been breached "are quite separate from the facts to be determined in the principal suit, and automatic jurisdiction over such contracts is in no way essential to the conduct of federal-court business." *Id.* at 381.

11

The same logic applies to petitions for equitable expungement. As the Seventh Circuit recently explained, a "request for equitable expungement is not factually dependent on the underlying criminal case in any sense that matters. Instead, it will always turn on facts collateral to or arising after the case is over—in short, matters external to the criminal case itself." *United States v. Wahi*, 850 F.3d 296, 302 (7th Cir. 2017). Here, the reasons Mettetal gives to support his petition for equitable expungement are that he has not run afoul of the law since he was arrested in 1995 and that his criminal record has had adverse professional and personal consequences. These matters, however, arose after he was arrested and involve facts quite separate and distinct from the criminal proceedings themselves. As such, Mettetal's petition is not "interdependent" with anything that was properly before the federal court. It therefore "requires its own basis for jurisdiction." *Kokkonen*, 511 U.S. at 378. Nor would ancillary jurisdiction satisfy *Kokkonen's* second prong. Equitable considerations which arise after the termination of court proceedings do not operate to vitiate decrees that went into effect years earlier.

In short, Mettetal's petition for equitable expungement of his criminal records does not implicate either of *Kokkonen's* conditions for the exercise of ancillary jurisdiction, and we join the unified front of circuit authority in rejecting his claim.

### III.

Amicus counsel now argues on appeal that because this court previously declared that Mettetal's arrest and convictions were unlawful, we have ancillary jurisdiction to consider his petition to expunge his records on those grounds. Assuming without deciding that ancillary jurisdiction exists to consider Mettetal's motion for expungement,

we find that Mettetal's petition fails on the merits. *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005) (we "may affirm on any grounds apparent from the record"); *see, e.g.*, *United States v. Field*, 756 F.3d 911, 915-16 (6th Cir. 2014) (noting in dicta its agreement with other circuits that "where motions for expungement challenge an unconstitutional conviction or an illegal arrest or are otherwise based upon a constitutional claim, federal courts may have jurisdiction to consider the motion"). On balance, expungement is rarely justified. *See United States v. Bagley*, 899 F.2d 707, 708 (8th Cir. 1990).

Mettetal argues that where a court overturns an arrest or conviction for lack of probable cause, that record must be expunged. As the Eighth Circuit pointed out in *Bagley*, it is "difficult to imagine that expunction, a remedy to be used in extreme circumstances, should be exercised every time a case is dismissed because evidence is suppressed." 899 F.2d at 708. Indeed, the cases Mettetal points to in support of this claim involved much more "extreme circumstances," like mass arrests intended to curb the expression of civil rights. *See Sullivan v. Murphy*, 478 F.2d 938 (D.C. Cir. 1973) (arrest of over 14,000 antiwar demonstrators); *United States v. McLeod,* 385 F.2d 734 (5th Cir. 1967) (large-scale arrests intended to harass and intimidate black voters). These circumstances are so different from the ones before us that they afford no assistance to Mettetal's argument.[4]

---

[4] It is also worth noting that Congress has provided for expungement of criminal records only in discrete and limited circumstances and has not come close to providing such a remedy in circumstances such as these. *See, e.g.*, 10 U.S.C. § 1565(e) (2006) (requiring expungement of DNA records after a court overturns a military conviction); 18 U.S.C. § 3607(c) (2006) (permitting expungement of criminal records in enumerated drug (Continued)

13

The judiciary and the public possess an independent interest in maintaining a full and accurate account of court proceedings and the judiciary's own role in the vindication of criminal defendants' constitutional rights. *See Doe v. Public Citizen*, 749 F.3d 246, 266 (4th Cir. 2014) ("[P]ublic access promotes not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary."); *Jessup v. Luther*, 277 F.3d 926, 928 (7th Cir. 2002) (linking full judicial records to "the values protected by the free-speech and free-press clauses of the First Amendment" and to adequate public monitoring of judicial performance); *Nixon v. Warner Communications*, 435 U.S. 589, 602 (1978) (recognizing the "presumption . . . in favor of public access to judicial records"). We find no reason to believe that this interest is not present here.

In sum, then, Mettetal's petition falls short of the criteria necessary for the court to expunge the records of his vacated arrest and convictions.

The judgment of the district court is accordingly

*AFFIRMED*.

---

possession cases); 42 U.S.C. § 14132(d) (2006) (permitting expungement of FBI DNA records in certain cases after a conviction is overturned). Legislation to further broaden the application of expungement has failed to progress. *See, e.g.* H.R. 2449 112th Cong. (2011).